**QUAST TRANSFER, INC., Relator,**

v.

**MINNESOTA TRANSPORTATION REGULATION BOARD, Wren, Inc., d/b/a Lakeville Motor Express, August Deike Transfer, Inc., et al., Hyman Freightways, Inc., et al., Respondents.**

No. C7–88–515.

Court of Appeals of Minnesota.

Aug. 30, 1988.

James E. Ballenthin, Luther, Ballenthin & Carruthers, Minneapolis, for Quast Transfer, Inc.

Allen E. Giles, Sp. Asst. Atty. Gen., Transp. Regulation Bd., South St. Paul, Jon Erik Kingstad, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Transp. Regulation Bd.

Richard L. Gill, Minneapolis, for Wren, Inc., d/b/a Lakeville Motor Express.

Timothy H. Butler, Minneapolis, for Deike Transfer, Inc., Midwest Motor Express, Inc. and Morrell Transfer, Inc.

Robert D. Gisvold, Minneapolis, for Hyman Freightways, Inc., et al.

Heard, considered and decided by NIERENGARTEN, P.J., and FOLEY and SCHUMACHER, JJ.

## OPINION

NIERENGARTEN, Presiding Judge.

Quast Transfer, Inc. (Quast) appeals from an order from the Minnesota Transportation Regulation Board (Board) revoking Quast's irregular common carrier permit based on a finding that Quast illegally served irregular route points on a regular route basis and that such conduct showed willful disregard for the Board and the applicable law.

The Board's decision affirmed the administrative law judge's (ALJ) finding that Quast provided unlawful regular route service but disagreed with the ALJ's recommendation that Quast's irregular route permit be restricted to carrying 10,000 pounds or more. We affirm.

## FACTS

Prior to 1982, Quast's regular route permit granted authority to transport less-than-truckload (LTL) shipments of general commodities overnight between Winsted, Minnesota and the Twin Cities, the specific cities named on its regular route permit. Quast used several trucks to pick up many small shipments which were then taken to the freight terminal where the shipments were unloaded, sorted and reloaded into delivery trucks (a "cross-dock operation"). Or, after cross-docking, the shipment might be loaded into another truck and moved to a second terminal (a line-haul movement) and then cross-docked and loaded into delivery trucks for delivery to the consignees (peddle operation). Quast was able to provide scheduled service over each route, arriving at each city on the route at approximately the same time each day. Large volume shipments were handled under an irregular route permit which provided for direct shipments from the consignor to consignee, without stopping at a terminal and without cross-docking or use of peddle vehicles.

In 1982 Quast extended its regular route authority to the Benson/Ortonville area and later that year sought an extension of its regular route authority to a number of counties in south central and western Minnesota. Meeting opposition, Quast amended its petition to exclude St. Cloud, St. Joseph, Collegeville, Sartell, Sauk Rapids and Alexandria, and the amended petition was granted March 29, 1983.

In August 1983, Quast again attempted to extend its regular route authority to the six points excluded in the March 1983 order. The request was denied by the ALJ who found Quast made some earlier illegal shipments to Alexandria but was not an unfit carrier. The ALJ indicated the violations were a matter of public record and could be considered if a pattern of continuing violations developed and suggested remedial action could be taken. The ALJ found that the criteria of public necessity and need were not met and thus recommended denial of the petition.

In January 1985 Quast opened a terminal in Fergus Falls, even though it did not have a regular route certificate to Fergus Falls. It began serving points in the Fergus Falls area through a system of cross-docking LTL shipments collected at the terminal for delivery to area consignees by peddle vehicles. Quast also began serving Alexandria from its Benson terminal and St. Cloud and four other excluded communities through its terminal just outside of St. Cloud. Quast also established terminals in Slayton, Mankato and Rochester and provided similar service to these areas. Quast held no regular route authority to serve any of these areas.

In May 1986, the Minnesota Department of Transportation (MNDOT) investigated Quast's operations out of Slayton and concluded that the activities there bore characteristics of a regular route common carrier

service, as did Quast's advertising of direct and overnight shipment. MNDOT issued a letter to Quast on July 9, 1986 ordering Quast to stop all regular route service except as authorized by its certificates. MNDOT specifically drew attention to the fact that Quast's advertising made no distinction in the service offered to regular and irregular route points and that Quast carried shipments with regular and irregular destinations on the same truck which was specifically prohibited by Minnesota Rule 7800.1600, subpart 1.

Quast proposed a plan of operation that ostensibly would meet MNDOT's charges of incorrect rates and improper advertising and solicitation of business. Quast also promised to apply for an extension of its regular route service.

On September 26, 1986, MNDOT responded to Quast indicating that Quast's proposals on sales and solicitation and advertising were insufficient and directed Quast to cease its present activity by October 20, 1986. Quast's response indicated it would

> voluntarily limit its operation under its IRCC [irregular route common carrier] permit to the transportation of volume shipments, transport shipments to meet the special service needs of customers * * *.

and further indicated that

> It is possible in isolated instances Quast may continue to provide service of very limited duration after October 20, 1986, to meet customer needs while the customers seek alternative service.

On October 7, 1986, the complaint in this proceeding was filed with the Board. Prior to October Quast transported about 600 shipments which respondents allege were unauthorized. In addition, between December 1 and 12, 1986, 93 alleged unauthorized shipments were made. Quast claimed that only an average of 2.8 shipments per day were unauthorized and these were the result of driver mistake or error.

## ISSUE

Is the Board's determination that Quast operated as a regular route common carrier without the appropriate certification supported by substantial evidence and not arbitrary or capricious?

## ANALYSIS

### Scope of Review

When we review an administrative agency decision, we

> will not disturb findings of fact * * * unless it appears from the entire record that the finding is unsupported by substantial evidence.

*Minnesota Microwave, Inc. v. Public Service Commission*, 291 Minn. 241, 244, 190 N.W.2d 661, 664 (1971). We presume those decisions are correct because of "the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977).

Our review of agency decisions is governed by statute and we will reverse, remand or modify the decision

> if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> (a) In violation of constitutional provisions; or
>
> (b) In excess of the statutory authority or jurisdiction of the agency; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or
>
> (e) Unsupported by substantial evidence in view of the entire record as submitted; or
>
> (f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1986).

### Applicable Law

No person shall operate as a motor carrier or advertise or otherwise hold out as a motor carrier without a certificate or permit in full force and effect. A certificate or permit may be suspended or revoked upon conviction of violating a provision of sections 221.011 to 221.296 or an order or rule of the commissioner or board governing the operation of motor carri-

ers, and upon a finding by the court that the violation was willful. The board may, for good cause after a hearing, suspend or revoke a permit for a violation of a provision of sections 221.011 to 221.296 or an order or rule of the commissioner or board issued under this chapter.

Minn.Stat. § 221.021 (1986). The ALJ determined Quast was operating a regular route common carrier service under authority of its irregular route common carrier permit by "affirmatively structured operations which Quast should have known were regular route in nature," over irregular routes.

■ The distinction between carriers is defined as follows:

"Regular route common carrier" means a person who holds out to the public as willing, for hire, to transport passengers or property by motor vehicle between fixed termini over a regular route upon the public highways.

Minn.Stat. § 221.011, subd. 9 (1986).

"Irregular route common carrier" means a person who holds out to the public as willing to transport property from place to place over highways for hire but who does not operate between fixed termini or over a regular route or on regular time schedules.

*Id.* subd. 11.

The distinguishing terms for the two types of routes are "fixed termini" and "regular route," which are not defined by statute.

### Fixed Termini

"Fixed termini" has been defined as follows:

In transportation usage "fixed termini" means two points between which the carrier regularly operates. * * * We conclude that termini become fixed within the meaning of the Motor Carrier Act when the carrier operates habitually between specified points.

*In re Wendell Moore*, (unpublished) slip op. at 4. (Minn. Railroad and Warehouse Commission, August 14, 1961). The Commis-

sion in *Wendell Moore* also noted that an irregular route carrier was not permitted to travel over regular routes and noted that "if a carrier repeatedly and customarily transports freight between fixed termini, he will repeatedly and customarily follow the most convenient route between such fixed termini." *Id.*

Clearly Quast made shipments to Fergus Falls, St. Cloud, Alexandria and Slayton almost daily in June and September without regular route authority, even after MNDOT ordered Quast to cease.

### Regular Routes

Almost all the freight delivered by Quast was transported from Winsted (a regular route terminal) to the other outlying terminals in a line-haul truck on a daily or nightly basis. All freight was then cross-docked and transferred to peddle trucks for distribution. Quast argues that the movement of these peddle trucks is irregular and thus makes the entire operation irregular. The argument fails under close scrutiny. The first and longest part of the shipment transfer from Winsted to the terminal already had been completed over a regular route. The second portion, from the terminal to the consignee was made by peddle trucks in a relatively restricted geographic area. Although the peddle truck might arrive at a different time of the day, delivery to such a restricted area on a daily basis would require peddle trucks to travel regular routes, or make an artificial effort not to do so.

In some cases the peddle vehicles were transporting both regular and irregular shipment and the routing was then governed by the regular route operation. For example, Quast had regular route operation points on either side of Alexandria, which was an irregular route point. Quast testified that while the points on either side of Alexandria would know what time the truck was coming, the Alexandria pick-ups would not know because Alexandria was irregular. Since the same truck was making all three stops, the argument is not compelling.

Quast's advertising emphasized its overnight service between the Twin Cities and 970 points in the south central portion of Minnesota, regardless of the size of the shipments and without differentiating between the service to regular route points or irregular route points. Quast's tariffs only authorized the return of freight costs on regular route points if Quast failed to meet its guaranteed overnight delivery. Yet Quast advertised as guaranteeing overnight delivery on all deliveries, regular or irregular. At the hearing Quast testified that all its customers knew that they would get freight charges back if Quast failed to deliver overnight only if delivery was to a regular route point. However, Quast could not explain how the customers knew or what specifically the "guarantee" was for irregular points. Quast also filed tariffs establishing identical rate structures for regular and irregular route points within the area it promised to serve overnight.

### Regular Schedule

■ All of the 970 delivery points named in Quast's advertising were not included on Quasts regular route permit, although they were served over regular routes. Quast maintains these points were served under its irregular permit. However, the irregular route definition prohibits operation between fixed terminals and over a regular route, and operation on a regular schedule. A carrier operates under a "regular schedule" if:

the carrier's operations are marked by a *regularity of service which is so fixed and definite that it becomes known to, and is relied upon by, all shippers and consignees who use his service.*

*In re Wendell Moore,* (unpublished) slip op. at 4 (emphasis added). A change in the hour or day of the week does not change the character of the operation. *Id.*

### Tacking

■ Quast claims that in its 1982 application it requested permission to tack its regular route authority with its irregular authority and such authority was granted. The 1983 grant had an Addendum listing all of Quast's regular routes, including the most recent grant. The Addendum was labeled:

Quast Transfer, Inc.

Minnesota Regular Route
Operating Authority

Permanent

The last route described stated:

38) The above-described routes and off-route points may be tacked and combined with each other and with applicant's existing authority to provide a through service between all points authorized to be served.

Quast argues the phrase "with applicant's existing authority" refers to its irregular route authority. The reasoning is tortured.

First, both Quast's application in 1982 and the Board's grant clearly involved only regular route authority. The listing of routes was captioned "Regular Route Operating Authority." The final route clearly referenced the ability to tack *regular* routes not irregular route authority. There is no mention of irregular route authority in either Quast's request or the Board's grant.

Second, if Quast's interpretation were correct, it would have been given authority to move from Winsted to the six points (Alexandria, Sartell, St. John's, Collegeville, St. Joseph, and Sauk Rapids). The Board specifically excluded these points because these cities were deemed to have adequate service already.

Third, the Board has promulgated an administrative rule which specifically prohibits commingling regular and irregular route shipments in the same vehicle. *See* Minn.R. 7800.1600, subpt. 1 (1987). This rule effectively precludes tacking of regular and irregular routes.

Finally, Quast's claim of tacking authority is inconsistent with its own activities. Although this alleged tacking authority was granted in early 1983, in late 1983 Quast continued to pursue regular route authority to places like Alexandria and St. Cloud which, according to its tacking theory, Quast already had the ability to service

legally. Quast did not raise the tacking defense until the hearings in the present case. Quast's claimed tacking authority seems to be an after-the-fact justification for activities Quast knew were outside the scope of its authority.

## DECISION

The Board's determination that Quast operated as a regular route common carrier without appropriate certification is supported by substantial evidence.

AFFIRMED.