In the Matter of the Petitions of: D & A TRUCK LINE, INC., (C3–94–763), Carrier Permit No. 61593, Arthur T. Mulvihill, d/b/a Bloomington Transfer, (C5–94–764), Carrier Permit No. 33895, Allen Metcalf Moving & Storage Co., Inc., (C7–94–765), Carrier Permit No. 2620, Linderholm Trucking, Inc., (C9–94–766), Carrier Permit No. 37195, Winter Truck Line, Inc., (C0–94–767), Carrier Permit No. 35883, Bay and Bay Transfer, Inc., (C5–94–781), 55337 Carrier Permit No. 62436, and Tyson Truck Lines, Inc., (C9–94–1142), Carrier Permit No. 781 for Reconsideration of Conversion of Irregular Route Common Carrier Permits.

Nos. C3–94–763, C5–94–764, C7–94–765, C9–94–766, C0–94–767, C5–94–781 and C9–94–1142.

Court of Appeals of Minnesota.

Nov. 1, 1994.

John R. Koch, Reichert, Wenner, Koch & Provinzino, P.A., St. Cloud, for all carriers with the exception of Tyson Truck Lines, Inc.

Rollin H. Crawford, LeVander, Gillen & Miller, South St. Paul, for Tyson.

Anthony C. Vance, Washington, DC, for Tyson Truck Lines, Inc.

Hubert H. Humphrey, III, Atty. Gen., Anu Seam, Asst. Atty. Gen., Margie Hendriksen, Asst. Atty. Gen., St. Paul, for MN Transp. Regulation Bd.

Considered and decided by FORSBERG, P.J., and HUSPENI and THOREEN,* JJ.

## OPINION

FORSBERG, Judge.

Relators, seven Minnesota motor carriers, seek review of orders issued by the Minnesota Transportation Regulation Board (MTRB). The MTRB's orders converted relators' authority from irregular route authority to class I or class II authority, following the revision of the Minnesota Motor Carrier Modernization Act, Minn.Stat. §§ 221.011–.85 (1992). In this appeal, relators challenge the MTRB's interpretation of certain provisions of the Act. Relators also challenge the extent of the operating authority granted to them. We affirm.

## FACTS

Before 1992, Minnesota motor carriers were essentially divided into two classes of carriers: regular route carriers and irregular route carriers. Minn.Stat. §§ 221.011–.84 (1990 & Supp.1991). Regular route carriers

were required to show public convenience and necessity for their routes and were authorized to operate between fixed termini and over regular routes. Minn.Stat. § 221.011, subd. 9 (1990). Irregular route carriers were expected to meet a need for flexible, "on-call" business that was not met by regular route carriers. Irregular route carriers could not operate between fixed termini or over regular routes. Minn.Stat. § 221.011, subd. 11 (1990).

Disputes arose over the extent of the irregular route carriers' operations. In several cases brought before the MTRB, it was alleged that irregular route carriers were beginning to act like regular route carriers, without the required certification and regulation by the MTRB. As a result, the Motor Carriers Modernization Act of 1992 changed the structure of motor carrier regulation in Minnesota. The Act designed a new system of class I certificates and class II permits.

Class I carriers must demonstrate public convenience and necessity for their designated routes and must own, lease, or otherwise control more than one terminal. Minn.Stat. §§ 221.071, subd. 1; .072, subd. 1 (1992). Class II carriers, on the other hand, cannot own, lease, or otherwise control more than one terminal. Minn.Stat. § 221.121, subd. 6c (1992). But a class II permit carrier may transport freight "to and from any point named in the permit, without restriction as to routes, schedules, or frequency of service." Minn.Stat. § 221.121, subds. 6e, 6f (1992).

Class II permits are divided into two general types: class II–T and class II–L. A class II–T permit allows a carrier to transport "truckload freight," which is defined as

> freight collected by a motor carrier (1) from one consignor at a single place and delivered directly to one or more consignees, or (2) from one or more consignors and delivered directly to one consignee at a single place.

Minn.Stat. § 221.011, subd. 35 (1992). A class II–L permit allows a carrier to transport "less-than-truckload" freight, which is

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

freight that is not truckload freight. Minn. Stat. § 221.011, subd. 36.

Relators are former irregular route carriers who applied for conversion of their permit authority into both class I certificates and class II permits. After considering relators' evidence and arguments, the MTRB issued orders converting most of relators' irregular route permits into both class II–T and class II–L permits. Tyson Truck Lines' authority was converted into a class I certificate.

### ISSUES

1. Did the MTRB err by limiting relators' class II–L authority to certain designated "points" consisting of cities and municipalities outside the Twin Cities metropolitan area?

2. Did the MTRB engage in illegal rulemaking when construing the term "points" as used in the 1992 Act?

3. Did the limitation of relators' class II–L authority violate relators' due process property rights?

4. Did the MTRB properly limit relators' evidence of prior operating authority?

5. Does the 1992 Act prevent the MTRB from converting an irregular route permit into both a class I certificate and a class II permit?

6. Did the MTRB erroneously construe the Act as prohibiting the transfer of freight between vehicles owned by the same motor carrier?

7. Did the MTRB err by failing to grant Tyson a statewide temperature-controlled commodities permit?

8. Did the MTRB err by failing to specifically define Tyson's "off-route" authority?

9. Are Tyson's arguments concerning the "public warehouse exclusion" ripe for review, and does Tyson have standing to raise those arguments?

### ANALYSIS

#### I.

The 1992 Act limits conversion of a carrier's authority to class I or class II authority in the following manner:

Subd. 4. **Authority converted.** (a) The [MTRB] shall not issue any certificate or permit under this subdivision that authorizes the carrier to serve any geographic area or transport any commodities that the carrier was not authorized to serve or transport under the expiring certificate or permit.

(b) Notwithstanding paragraph (a), the [MTRB] shall not grant a class II–L permit to an applicant under this subdivision that names points that the permit holder did not serve at any time in the two years before April 30, 1992.

Minn.Stat. § 221.152, subd. 4 (1992).

Citing the above statute, the MTRB limited relators' class II–L authority to and from designated "points," consisting of named cities and municipalities outside the metropolitan area.

Relators argue that MTRB's construction of the above statute is erroneous. Relators claim that even if a class II–L permit must name the points actually served in the two years before April 30, 1992, a class II–L carrier still has the authority under clause (a) of the above-cited statute to serve the geographic areas surrounding the named points.

Relators' argument involves the construction of Minn.Stat. § 221.152, subd. 4. Our object when construing a law is to determine the legislature's intent. Minn.Stat. § 645.16 (1992).

In support of its decision, the MTRB argues that the object of the 1992 legislation was to create a balance between regular and irregular route carriers and to allow the former irregular route carriers to legally transport less-than-truckload freight. According to the MTRB, the fact that some irregular route carriers had been regularly transporting less-than-truckload freight was evidence that those carriers were operating as uncertificated regular route carriers. The MTRB claims that the 1992 Act was intended to specifically limit the new class II–L carriers' less-than-truckload operations to points that they had actually served in the last two years under their irregular route authority.

Relators disagree with the MTRB's arguments. Relators claim that motor carriers' operating authority has always been defined in terms of areas to be served, rather than individual points. In support of their argument, relators point to other sections in the 1992 Act that address service to an "area," rather than to a "point." But in Minn.Stat. § 221.121, subd. 6f (1992) the legislature stated:

> (b) A motor carrier with a class II–L permit may transport less-than-truckload freight to and from any point named in the permit, without restriction as to routes, schedules, or frequency of service.
>
> (c) A motor carrier with a class II–L permit may transport less-than-truckload freight to and from points within the geographic area the carrier was authorized to serve on December 31, 1992, that were not listed in the carrier's permit. Service by a carrier under this paragraph may be provided no more often than on 24 days in a 12–month period.

This language addressing transportation "to and from points" within geographic areas reveals an intent to define class II–L authority in terms of points, rather than geographic areas.

Relators cite several federal cases for the proposition that service to an entire area is authorized by service to a point. But the federal courts in those cases were not interpreting the 1992 Minnesota Motor Carrier Modernization Act.[1] The cited cases are not determinative of the Minnesota legislature's intent in drafting Minn.Stat. § 221.152, subd. 4.

Relators also cite *In re Dawn Moving & Storage, Inc.*, Permit Nos. 25157 & 34535/T–76–315 (Minn.Pub.Serv.Comm'n, Nov. 9, 1976), in which an administrative law judge determined that service to several representative points entitled a carrier to serve an entire area. But unlike the statute at issue in *Dawn*, section 221.152 states that a permit cannot "name[ ] points" that the applicant did not serve within the past two years. Minn. Stat. § 221.152, subd. 4(b). There was no similar language at issue in *Dawn*.

Relators claim that service to a city within the past two years should authorize service to the entire county, citing the fact that the MTRB has considered proof of service to one city in a Twin Cities metropolitan area county to constitute proof of service to the entire county. The MTRB explained, however, that the Twin Cities metro area should be treated differently because the metro area is unique: its population is dense and the boundaries between different cities are often unclear, making it impractical to list each city therein as a separate identifiable point. These characteristics provide a reasonable basis for distinguishing the Twin Cities metro area from other areas of the state.[2]

Relators argue in the alternative that if the MTRB properly limited class II–L authority to specific "points" named in the permit, then the term "points" should not be defined as cities or municipalities, but should be defined more broadly, to encompass larger areas, such as counties. But relators concede in their brief that the general understanding in the motor carrier industry is that a point is "generally no larger than the corporate limits of a city or town."

The MTRB properly defined "points" as cities or municipalities. A Minnesota House of Representatives Policy Brief defined a "service point" generally as

> any specific place to or from which the TRB has authorized a carrier to provide service. It can be a city or an unincorporated area.

---

1. For example, in *United States v. Carolina Freight Carriers Corp.*, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942), cited by relators, the "grandfather clause" at issue provided for the issuance of a certificate without showing public convenience and necessity "if the carrier was "in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time." *Id.* at 480, 62 S.Ct. at 725.

2. When authorizing a class II–L carrier to serve an entire county in the metro area based upon service to one city in that county, the MTRB still specifically authorized the carrier to serve all "points" within the county. In other words, the MTRB has consistently limited a class II–L carrier's authority to "points," rather than geographic areas.

John Williams, Legislative Analyst, *The 1992 Motor Carrier Reform Act: What it Does, and Why* 13 (Research Dep't, Minn. House of Representatives, July 1992). In *Ace World Wide Moving & Storage of Rochester Co.*, Permit No. 64851 (Minn. Transp. Regulation Bd., Jan. 12, 1993), which the MTRB incorporated by reference, an ALJ stated: "[T]he Board has generally considered cities or facilities to be the 'points' that a carrier is authorized to serve." In *Quast Transfer, Inc. v. Minnesota Transp. Regulation Bd.*, 428 N.W.2d 462 (Minn.App.1988), this court addressed the issue of a carrier's irregular route authority to serve the six "points" (i.e., cities or municipalities) of Alexandria, Sartell, St. John's, Collegeville, St. Joseph, and Sauk Rapids. *Id.* at 466.

## II.

The 1992 Act requires the MTRB to "develop an expedited process for hearing and ruling on applications" to convert regular or irregular route authority to class I or class II authority. Minn.Stat. § 221.152, subd. 3(b) (1992). Relators claim that this language requires the MTRB to publish written rules governing the procedures that it developed pursuant to this authority. The statute does not state that the MTRB must publish written rules governing the expedited process. The MTRB apparently applied its existing rules of practice and procedure to these proceedings.

Relators also argue that the MTRB, in adopting its definition of a "point," proceeded in violation of the rulemaking procedures of the Minnesota Administrative Procedure Act, Minn.Stat. §§ 14.131–.47 (1992). Relators allege that the MTRB improperly developed its definition in a one-day meeting. Notice of the meeting was posted on a bulletin board three days in advance of the meeting, but relators did not receive notice of the meeting.

■ An agency ordinarily has the right and discretion to develop policies either by rulemaking or on a case-by-case basis. *Bunge Corp. v. Commissioner of Revenue*, 305 N.W.2d 779, 785 (Minn.1981). Here, the MTRB developed its definition of "points" by

adjudication, rather than rulemaking. The MTRB applied its interpretation of the term "points" to the facts of each of relators' cases.[3]

■ Relators also allege that the MTRB's June 29 meeting violated the Minnesota Open Meeting Law; therefore, relators request that the MTRB's definition of the term "point" be invalidated. That is not the correct remedy for a violation of the Open Meeting Law. *See Sullivan v. Credit River Township*, 299 Minn. 170, 177, 217 N.W.2d 502, 507 (1974) (refusing to invalidate actions that were the result of a closed meeting because the law was directory, rather than mandatory); Minn.Stat. § 471.705, subd. 2 (1992) (providing remedy of statutory penalty for violation of the Open Meeting Law).

## III.

■ Relators argue that their prior irregular route authority to serve large portions of the state constituted a protected property right, which was impaired when the MTRB construed the term "points" to limit their class II–L authority. We disagree.

In *Bird v. State, Dep't of Pub. Safety*, 375 N.W.2d 36 (Minn.App.1985) we explained that to have a property interest in something, an individual must not have simply a unilateral expectation or an abstract need or desire for it; rather, the individual must have a legitimate claim of entitlement to it. *Id.* at 42 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

In *Schultz v. City of Duluth*, 163 Minn. 65, 203 N.W. 449 (1925), the supreme court characterized the use of public streets for private enterprise as "a privilege that may be granted, regulated, or withheld." *Id.* at 68, 203 N.W. at 450; *see also Anderson v. Lappegaard*, 302 Minn. 266, 273, 224 N.W.2d 504, 509 (1974) (tax on trucker based on weight is merely a return for the "privilege" of using the state's highways).

In *State v. LeFebvre*, 174 Minn. 248, 219 N.W. 167 (1928), the supreme court conclud-

---

**3.** Relators do not allege that the MTRB issued a memorandum or policy statement stating how

the MTRB would define the term "point" in the future.

ed that, upon enactment of the statute requiring certificates of public convenience and necessity for common carriers, a former carrier did not have a constitutional right to such a certificate:

> The claim of the defendant that existing operators * * * were entitled to certificates as a matter of constitutional right is without merit. Section 10 of the chapter cares for existing operators liberally. A carrier operating at the time of the enactment of the statute has no constitutional right to continue without observing it.

*Id.* at 257, 219 N.W. at 171. In *Paron v. City of Shakopee*, 226 Minn. 222, 32 N.W.2d 603 (1948), the court held that one who is licensed to engage in a business, trade or occupation subject to legislative control and regulation does not acquire a vested right to continue; all of a citizen's rights and liberties are held in subordination to the legislature's reasonable regulations and restrictions. *Id.* at 229, 32 N.W.2d at 608.

We conclude that when the Minnesota Motor Carriers Act was substantially revised, relators had a mere expectation of a continued permit.

## IV.

■ A carrier submitting an application to convert prior operating authority to a class II–L permit must submit evidence of the prior authority that was "actually exercised;" i.e., "bills of lading, company records, operation records, or other relevant evidence." Minn.Stat. §§ 221.151, subd. 1 (1992); .152, subd. 3(a). The MTRB relied solely on relators' shipping abstracts to determine the operating authority that relators had previously exercised. Relators claim that the MTRB also should have considered their statements of tariffs filed with the MTRB, recommendations from shippers, advertising summaries, and other company records not specifically identified by relators.

The MTRB interpreted the statutory term "authority * * * actually exercised" as requiring evidence of the points that relators had actually served. This interpretation reflects the plain meaning of section 221.151, subd. 1. *See* Minn.Stat. § 645.16 ("When the words of a law * * * are clear and free from

all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit.").

Relators cite several cases from other jurisdictions addressing what constitutes an actual exercise of operating authority. The cited cases are of limited use when determining what the Minnesota legislature intended by the term "authority * * * actually exercised."

Relators cite *Dawn*, where the MTRB's predecessor, the Public Service Commission, concluded that Minn.Stat. § 221.151, subd. 1 did not require a mechanical application of origin and destination points. *Dawn* is distinguishable because the authority at issue there was the authority to transport household goods, which the Commission characterized as, by its nature, distinguishable from the authority to transport general commodities. Furthermore, *Dawn* was decided under the prior motor carrier laws. The 1992 Act singles out class II–L carriers, requiring specific evidence to ensure that they do not exercise any authority that was not specifically exercised in the past. If relators were allowed to submit statements of tariffs, recommendations from shippers, and advertising summaries, they could gain statewide class II–L authority—a result the statute was apparently enacted to avoid.

## V.

■ Minn.Stat. § 221.152 provides:

> All holders of certificates and permits * * * must convert the certificates and permits into class I *or* class II certificates or permits.

*Id.*, subd. 2 (1992) (emphasis added). The MTRB properly concluded that the plain meaning of the above statute allows motor carriers to convert an authority to either a certificate or a permit, but not to both. When a statute is clear and unambiguous, the statute is not open to construction. Minn.Stat. § 645.16. Generally, the term "or" is disjunctive. *State v. Rossow*, 310 Minn. 399, 401, 247 N.W.2d 398, 400 (1976); *Aberle v. Faribault Fire Dep't Relief Ass'n*, 230 Minn. 353, 360, 41 N.W.2d 813, 817 (1950); *Pettit Grain & Potato Co. v. North-*

*ern Pac. Ry. Co.*, 227 Minn. 225, 229, 35 N.W.2d 127, 130 (1948).

Relators correctly point out that one carrier may hold both a certificate and a permit as two separate authorities. *See* Minn.Stat. § 221.121, subd. 6c(2) (1992) (class II carrier also may hold a class I certificate under certain circumstances). But this does not support the proposition that one authority may be split into both a certificate and a permit, contrary to the plain language of the statute.

## VI.

■ The primary difference between class I and class II carriers is that class I carriers must own, lease, or otherwise control more than one terminal, whereas class II carriers are prohibited from owning, leasing, or otherwise controlling more than one terminal. *Compare* Minn.Stat. § 221.072, subd. 1 (1992) *with* Minn.Stat. § 221.121, subd. 6c. A "terminal" includes any location at which freight is exchanged "by *motor carriers* between vehicles." Minn.Stat. § 221.011, subd. 40 (1992) (emphasis added).

Relators claim that the statutory definition of "terminal" does not prohibit one carrier from exchanging freight between its own vehicles. Relators point out that "terminal" is defined as any location where freight is exchanged by "motor carriers" between vehicles. Relators claim that by its use of the plural "motor carriers," the legislature has evidenced an intent not to prohibit the exchange of freight between vehicles owned by a single motor carrier.

■ Relators' argument involves the question of legislative intent. The legislature has provided the following canon for use in construing its statutes: "The singular includes the plural; and the plural, the singular." Minn.Stat. § 645.08(2) (1992). The legislature is presumed to be aware of this canon. *State v. Industrial Tool & Die Works, Inc.*, 220 Minn. 591, 604–05, 21 N.W.2d 31, 38–39 (1945). Applying this canon to the facts of this case, the definition of "terminal," which refers to "motor carriers," must be construed as also prohibiting one "carrier" from transferring freight between its vehicles.

When determining legislative intent, we may also consider the object to be attained by the statute and the consequences of a particular interpretation. Minn.Stat. § 645.16(4), (6). We are not persuaded that the legislature would have intended to prohibit the transfer of freight only between vehicles owned by different motor carriers, without also addressing the transfer of freight between vehicles owned by one motor carrier.

## VII.

■ Relator Tyson Truck Lines, Inc. (Tyson) requested that its irregular route authority be converted to both a class I certificate and a class II permit, with authority to transport temperature-controlled commodities statewide. The MTRB issued Tyson a class I certificate after determining that Tyson owned, leased, or otherwise controlled more than one terminal.

The MTRB also granted Tyson the authority to transport temperature-controlled commodities over 58 designated routes, with authority to serve all intermediate and off-route points in 87 Minnesota counties. Furthermore, the MTRB authorized Tyson to tack all authorized routes "in order to provide a through service between authorized points."

Tyson objected to the MTRB's failure to grant a statewide temperature-controlled permit, citing Minn.Stat. § 221.152, subd. 4(d):

> When a person who, before January 1, 1993, held an irregular route common carrier permit under which the person transported temperature-controlled commodities applies for conversion of that permit to a class II permit * * *, the [MTRB] shall issue the applicant a temperature-controlled commodities permit with authority to operate in the same geographic area authorized under the person's irregular route common carrier permit and a class II permit.

Tyson argues that the above statute required the MTRB to issue it a temperature-controlled commodities permit with the statewide authority it held under its irregular route permit.

The above statute, however, only requires the MTRB to issue such a temperature-controlled commodities permit when a carrier has applied for and received a class II permit. In this case, the MTRB issued Tyson a class I certificate pursuant to Tyson's own application and after determining that, as a matter of law, Tyson was not entitled to a class II permit because it had more than one terminal. Therefore, we conclude the MTRB did not violate the provisions of Minn.Stat. § 221.152, subd. 4(d).

Tyson also claims that the MTRB failed to provide sufficient reasoning in support of its order granting the temperature-controlled commodities authority. Tyson has not explained why the MTRB's findings of fact are insufficient.

Tyson argues that the MTRB's order suggests that temperature-controlled commodities should be treated as class I freight; i.e., unloaded and cross-docked several times, which would not protect the commodities against heat or cold. To the contrary, the MTRB specifically stated that Tyson has a choice of which vehicles to use when transporting general commodities or temperature-controlled commodities. Furthermore, Tyson's class I certificate authorizes it to provide either truckload or less-than truckload service. Although Tyson generally argues that it is not cost-efficient to use refrigerated vehicles to transport general commodities, Tyson has not explained why it would be required to do so under the MTRB's order, or why the 58 routes designated in the MTRB's order, with off-route service authorized to every point in every county, are inadequate. In fact, Tyson's application for class I authority proposed the same routes and off-route points that it was granted.

## VIII.

■ The MTRB authorized Tyson to transport freight, including temperature-controlled commodity freight, to "off-route points." Tyson claims that because the term "off-route" is unclear and vague, it does not know whether it can serve an off-route point directly, without first being required to serve a point on one of the 58 authorized routes.

We note that the term "off-route" is one that has been used in the motor carrier industry for some time. *See Quast Transfer, Inc.*, 428 N.W.2d at 466 (quoting from operating authority granted in 1983 to serve "[t]he above-described routes and off-route points"); *In re Petition of Am. Freight Sys., Inc.*, 380 N.W.2d 192, 193 (Minn.App.1986) (carrier petitioned for authority over specified routes and other points as off-route points).

Furthermore, we note that the MTRB simply granted Tyson what it requested in its application. Tyson itself asked for off-route authority, and in a request for reconsideration, Tyson asked for authority to serve additional off-route points in Wadena County—a request which the MTRB granted.

The MTRB states in its brief that its order notified Tyson that it may provide direct service to customers on off-route points, as long as Tyson maintains its routes on a regular basis with whatever vehicles it chooses. This is an appropriate construction of the MTRB's order.

## IX.

The legislature has excluded from its definition of "terminal"

> a public warehouse with a storage capacity of at least 5,000 square feet that was licensed under chapter 231 [governing warehouses] on or before March 1, 1992.

Minn.Stat. § 221.011, subd. 40. The purpose of this "public warehouse exclusion" was to "grandfather in" several former irregular route carriers who owned this type of public warehouse.

Tyson owns three terminals that arguably could fall within the public warehouse exclusion. During the conversion application process, Tyson argued before the MTRB that the three terminals did not fall within the public warehouse exclusion. Therefore, according to Tyson, it owned more than one terminal, and qualified for a class I license. The MTRB accepted Tyson's arguments, and granted Tyson a class I license, based, in part, on a conclusion that Tyson had more than one terminal.

Now, for the first time on appeal,[4] Tyson argues that its three terminals meet the qualifications of the public warehouse exclusion. Tyson expresses concern that in the future, the MTRB might re-interpret the public warehouse exclusion, find that Tyson does not own more than one terminal, and revoke Tyson's class I permit on that basis. Tyson's arguments at this point are speculative, and therefore are not yet ripe for review. *See State ex rel. Mosloski v. County of Martin,* 248 Minn. 503, 506, 80 N.W.2d 637, 639 (1957) (certiorari will not lie to review anticipated wrongs).

Tyson also argues that the public warehouse exclusion violates equal protection because it unreasonably distinguishes between those warehouses owned and licensed before March 1, 1992 and those warehouses owned and licensed after March 1, 1992. The MTRB granted Tyson's request that its terminals not be considered within the public warehouse exclusion. Therefore, Tyson lacks standing to challenge the statutory classification, because Tyson has not been injured or adversely affected by the classification. *See In re State Farm Mut. Auto. Ins. Co.,* 392 N.W.2d 558, 564 (Minn.App. 1986) (party seeking judicial review of agency action must be aggrieved by that action) (quoting *In re Getsug,* 290 Minn. 110, 114, 186 N.W.2d 686, 689 (1971)).

## DECISION

The MTRB properly interpreted the language of the Motor Carrier Modernization Act when determining the extent of relators' operating authority.

**Affirmed.**

---

4. We have stated on numerous occasions that we will not consider issues on appeal that were not raised below. *See, e.g., Fredrich v. Independent Sch. Dist. No. 720,* 465 N.W.2d 692, 694 (Minn. App.1991) (appellate review is limited to the record), *pet. for rev. denied* (Minn. Apr. 29, 1991).