*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1831**


In the Matter of the Petition of
Northern States Power Company, d/b/a Xcel Energy,
for Approval of Its Proposed
Community Solar Garden Program.


**Filed May 31, 2016
Affirmed
Halbrooks, Judge**


Public Utilities Commission
File No. E-002/M-13-867

Christopher W. Madel, Jennifer M. Robbins, William Bornstein, Cassandra M. Batchelder, Robins Kaplan LLP, Minneapolis, Minnesota (for relator Sunrise Energy Ventures, LLC)

Lori Swanson, Attorney General, Anjali V. Shankar, Assistant Attorney General, St. Paul, Minnesota (for respondent Minnesota Public Utilities Commission)

Vernle C. Durocher, Jr., F. Matthew Ralph, Phil Steger, Brian B. Bell, Dorsey & Whitney LLP, Minneapolis, Minnesota (for respondent Northern States Power Company)

Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and

Toussaint, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## UNPUBLISHED OPINION

**HALBROOKS**, Judge

Relator, a developer of solar-energy facilities, challenges an August 6, 2015 order issued by respondent Minnesota Public Utilities Commission (PUC), arguing that the PUC (1) engaged in unlawful rulemaking, (2) violated relator's due-process rights, and (3) acted in excess of its statutory authority by limiting relator's interconnection rights. We affirm.

## FACTS

Minnesota's community solar garden (CSG) statute, Minn. Stat. § 216B.1641 (2014), was enacted in 2013 to promote solar growth in the state by providing individual customers and communities the opportunity to work together to have a community solar resource. Under this model, non-utility-scale customers who typically face economic barriers to participation in a solar program would purchase or lease a subscription at a central solar installation and receive a bill credit for the electricity generated in proportion to the size of their subscription. *See* Minn. Stat. § 216B.1641(a)-(b).

Under the statute, respondent Northern States Power Company d/b/a Xcel Energy was required to file a plan with the PUC outlining its proposed CSG program. Minn. Stat. § 216B.1641(a). Xcel met the statutorily defined deadline by submitting a proposed plan on September 30, 2013. The PUC received voluminous comments between October 4 and December 3, 2013, from various high-level stakeholders in the solar industry who provided input on Xcel's proposed plan. Based on this feedback, the PUC issued an

2

order on April 7, 2014, rejecting Xcel's proposal and requiring the company to file a revised CSG plan. Xcel complied by filing a revised plan on May 7, 2014.

After additional stakeholder commentary, the PUC issued an order on September 17, 2014, approving Xcel's modified CSG plan. Both this order and the previous April 7 order permitted co-location of CSGs but were silent on the topic of co-location caps. The program launched on December 12, 2014, and Xcel began accepting applications from individuals and developers hoping to construct and operate CSGs. The overall response to the CSG program was unquestionably more positive than originally anticipated, and Xcel became concerned that utility-scale producers were taking advantage of the lucrative benefits provided by the program. Relator Sunrise Energy Ventures, LLC submitted 100 applications in the first hour of the program.

Xcel first raised the issue of utility-scale developers on January 13, 2015, in supplemental comments submitted to the PUC. Xcel urged the PUC to place limitations on co-located solar gardens in the CSG program for multiple reasons, including (1) possible complications created by interconnecting utility-scale solar projects to the distribution system, (2) the company's belief that permitting large-scale operations to participate in the program would run counter to legislative intent, and (3) potential rate impacts to non-participating customers.

Xcel requested that the PUC affirm its intention to process only those applications proposing CSGs of no more than 1 megawatt (MW) in size, meaning that co-located applications from a single developer would be processed so long as they, in the aggregate, did not exceed 1-MW. On June 22, 2015, Xcel entered into a partial

3

settlement with several stakeholders in the solar industry. Sunrise was not part of this process. The agreement proposed to limit the aggregate capacity of co-located CSGs to 5-MW for applicants already in the approval queue and 1-MW for applications submitted after September 25, 2015, allowing Xcel to unilaterally scale down any larger CSGs and refund application deposits and fees associated with the scaled-down portions. The PUC held a public hearing in late June 2015 to discuss proposed limitations to the program. By the end of the hearing, the PUC had received, either orally or through written comments, extensive feedback from many stakeholders, including government entities, solar-industry representatives, nonprofit organizations, Xcel, and members of the public.

The PUC approved a modified plan adopting portions of the partial settlement agreement, including the CSG co-location caps. Sunrise filed a petition for reconsideration with the PUC on August 26, 2015, that the commission denied on October 15, 2015.[1] The PUC reiterated that its August 6, 2015 order modifying Xcel's plan to include co-limitation caps was based on its determination that "allowing unlimited co-location would render the 1 MW statutory limit superfluous, undermine the legislative intent to foster small, widely distributed solar gardens rather than utility-scale solar developments, and create a risk of significant rate increases to ratepayers." The PUC also denied Sunrise's request to stay the August 6 order pending appeal to this court. This certiorari appeal follows.

---

[1] The implementation of the CSG program is currently proceeding under the terms of the PUC's August 6, 2015 order.

4

**D E C I S I O N**

"On writ of certiorari, we determine whether the Commission violated the constitution, exceeded its authority, engaged in unlawful procedure, erred as a matter of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capriciously." *In re Investigation into Intra-LATA Equal Access & Presubscription*, 532 N.W.2d 583, 588 (Minn. App. 1995), *review denied* (Minn. Aug. 30, 1995). An agency's decision bears a presumption of correctness, and we defer to the agency's expertise in fact finding. *Id.* "When reviewing questions of law, however, we are not bound by the agency's decision and need not defer to the agency's expertise." *Id.*

## I.     RULEMAKING

Sunrise makes several arguments concerning the PUC's actions, including that the PUC (1) violated the Minnesota Administrative Procedure Act (MAPA) by failing to make required findings and failing to follow procedures required by Minn. Stat. § 216B.1641(e), (2) engaged in unlawful retroactive rulemaking, and (3) arbitrarily and capriciously decided to implement limitations on CSG co-location. Because these nuanced arguments depend on whether the PUC engaged in rulemaking, we first address that issue.

Under MAPA, a "'rule' means every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by that agency or to govern its organization or procedure." Minn. Stat. § 14.02, subd. 4 (2014). Thus, if an agency statement (1) has general applicability; (2) has future effect; and (3) is intended to

5

interpret or create law, policy, or procedure, it is a rule. 21 William J. Keppel, *Minnesota Practice* § 5.01 (2d ed. 2007).

Under this "expansive definition," an agency must generally promulgate legislative rules and interpretive rules. *In re PERA Salary Determinations Affecting Retired & Active Emps. of the City of Duluth*, 820 N.W.2d 563, 570 (Minn. App. 2012). "Legislative rules are those promulgated pursuant to delegated powers to make substantive law." *Minn. Transitions Charter Sch. v. Comm'r of Minn. Dep't of Educ.*, 844 N.W.2d 223, 233 (Minn. App. 2014) (quotation omitted), *review denied* (Minn. May 28, 2014). "Interpretive rules are those that make specific the law enforced or administered by the agency." *Id.* (quotation omitted). A properly promulgated rule, whether legislative or interpretive, is a powerful rule that has the full "force and effect of law." Minn. Stat. § 14.38, subd. 1 (2014).

The parties dispute whether the PUC's orders constitute rulemaking or merely clarify or interpret newly enacted statutory law. Sunrise argues that they constitute interpretive rules and that the PUC engaged in improper rulemaking by permitting caps on co-location, maintaining that the statute only restricts each parcel to a "nameplate capacity of no more than one megawatt." Minn. Stat. § 216B.1641(b). Sunrise's argument fails in several respects.

*Newly Enacted Statute*

An agency need not promulgate administrative rules as soon as a new statute goes into effect. "Not every principle can or should be cast *immediately* into the mold of a rule because *some principles must be adjusted to meet particular situations*." *Intra-LATA*

6

*Equal Access & Presubscription*, 532 N.W.2d at 590 (emphasis added). After Xcel's CSG program was unveiled, it quickly became apparent that the initial response to the program far outpaced what was anticipated. Xcel's original forecasted program participation ranged from 40- to 100-MWs over the span of five to ten years. By December 2014, Xcel noted that it had received over 400 applications representing more than 400-MW. By June 2015, the aggregate generating capacity had risen to nearly 1,000-MWs (1-GW) worth of applications—still in the program's initial roll-out period. Sunrise alone submitted 100 applications constituting 100-MWs within the first hour of the program's opening. These facts indicate that the PUC was not engaged in rulemaking but was modifying (or approving Xcel's request to modify) the plan to respond to implementation. In light of the overwhelming response to Xcel's CSG program, we conclude that the PUC made lawful and reasonable fact-specific determinations under the circumstances.

*General Applicability*

The PUC's orders are limited to Xcel. They outline the terms under which solar-power developers may participate in Xcel's program but do not purport to bind any energy company other than Xcel to the terms of the orders. Thus, the PUC's statements cannot be said to be of "general applicability."

*Statutory Interpretation*

The PUC's actions are consistent with the statute. "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). "A statute should be interpreted, whenever possible, to give

7

effect to all of its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Minn. Transitions Charter Sch.*, 844 N.W.2d at 227 (quotations omitted). Statutory interpretation is a question of law, which we review de novo. *Lee v. Lee*, 775 N.W.2d 631, 637 (Minn. 2009).

The statute reads: "There shall be no limitation on the number or cumulative generating capacity of community solar garden facilities other than the limitations imposed under section 216B.164, subdivision 4c, or other limitations provided in law or regulations." Minn. Stat. § 216B.1641(a). Sunrise interprets this phrase to mean that there can be no limitations at all imposed on co-location so long as the capacity of each individual nameplate does not exceed 1-MW. *See* Minn. Stat. § 216B.1641(b) ("The solar garden must have a nameplate capacity of no more than one megawatt."). We agree with Xcel and the PUC that such an interpretation renders the 1-MW nameplate provision superfluous. We read the "no limitation" provision in part (a) of the statute to refer to the CSG program as a whole. Interpreting the nameplate-capacity limitation to suggest that any given CSG may be indeterminately large is not consistent with that plain language of the statute.

Sunrise argues that the PUC "reversed course" in its August 6 order by placing caps on co-located CSGs for the first time after it issued two previous orders in which it did not place any limitations on co-location. In its August 6 order, the PUC acknowledged that it had previously required Xcel to allow CSGs to co-locate, but it also clarified that it "was not aware at that time of the extent to which developers planned to

co-locate gardens and thus did not address whether any limits should be placed on co-location."

We are unable to find any evidence supporting Sunrise's assertion that the August 6 order is inconsistent with the PUC's previous orders. At no time before August 6 did the PUC address whether limits should be placed on co-located CSGs. It addressed the idea of co-location *generally* but did not specifically address the issue of caps. Thus, nothing in the August 6 order is inconsistent with previous orders. Further, nothing in the order is inconsistent with the statute because the PUC placed no limitations on co-location; rather, it simply placed a cap on the aggregate co-location of CSGs in a single location so as not to render the 1-MW nameplate restriction superfluous.

*Utility-Scale Solar Producers*

Minnesota law provides a platform for the implementation of solar-energy production through two statutes—Minn. Stat. §§ 216B.164 (2014) and 216B.1641. If a developer proceeds under Minn. Stat. § 216B.164, that developer is subject to the Public Utilities Regulatory Policies Act of 1978 (PURPA), which provides that a qualifying facility (QF) such as Sunrise may take advantage of an "avoided cost rate." This rate is the "cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3(d) (2012). A developer proceeding under the CSG program is eligible for enhanced "applicable retail rates." It is undisputed that the rates available through the CSG program are higher than those available to developers through the traditional vehicle, which also involves a competitive bid process. Accessing higher

9

rates and avoiding a competitive bid process creates an incentive for developers to proceed under the CSG statute.

When Xcel brought the issue of utility-scale producers to the PUC's attention, it noted that of the approximately 400 applications it had received, only 75 separate sites were proposed. Xcel "described these large projects as resembling utility-scale solar development more than community-scale development, [which] was not consistent with what the Commission intended when approving the Company's program" and that "developers were essentially planning utility-scale solar projects; then, solely for the purposes of meeting program requirements, designating each one MW portion as a single garden." Xcel expressed concern that the "majority of subscribed production capacity was being marketed to large commercial and industrial customers and that there is potential for residential or small business customers to be largely excluded from participation."

The potential to "lock out" direct individual and community participants—the consumer base directly targeted by the CSG statute—is another indication that the statute is intended to allow communities and individuals historically foreclosed from cost-prohibitive solar energy the opportunity to take advantage of benefits previously unavailable to them. The PUC's August 6 order is consistent with the legislature's intent.

*Public Policy*

The PUC must ensure that any approved plans both "reasonably allow for the creation, financing, and accessibility of community solar gardens" and "be consistent with public interest." Minn. Stat. § 216B.1641(e)(1), (4). The statute also expressly

10

provides that "[t]he [PUC] may approve, disapprove, or modify a community solar garden." Minn. Stat. § 216B.1641(e).

In the August 6 order, the PUC determined that the co-location caps were a "workable solution consistent with the public interest and the statutory intent to create a solar-garden program that is community-focused." The PUC shared Xcel's concern that non-participating customers would be affected by a rate hike should Xcel be forced to accommodate unlimited co-location because of current infrastructure constraints. The PUC heard from many stakeholders in the solar industry at every point in the process and exercised its authority to modify the program in accordance with statutory requirements as the program changed in its implementation stages. Its actions are amply supported by a robust record, especially in light of the fact that the PUC has a statutory duty to provide a CSG program that is aligned with the public interest.

For these reasons, we conclude that the PUC did not engage in improper rulemaking[2] and did not err in interpreting the statute.

## II. DUE-PROCESS RIGHTS

*Substantive Due Process*

Sunrise argues that its 100 reservation letters represent property interests and serve as enforceable contracts. It also maintains that it was deprived of its property rights without just compensation when the PUC implemented co-location caps after Sunrise

---

[2] Because we conclude that the PUC did not engage in rulemaking, we decline to address the issues of whether the PUC violated MAPA by failing to make findings or failing to follow MAPA procedures and whether the August 6 order was arbitrary, capricious, or unsupported by substantial evidence.

invested large amounts of money into the CSG program. The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation." Minn. Const. art. 1, § 13. "It is well established that the government need not directly appropriate or physically invade private property to effectuate a taking." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 632 (Minn. 2007). Under certain limited circumstances, a taking may result through government regulation. *Id.* "In the context of government regulation a taking may result when the government 'goes 'too far' in its regulation, so as to unfairly diminish the value of the individual's property, thus causing the individual to bear the burden rightly borne by the public.'" *Id.* (quoting *Westling v. County of Mille Lacs*, 581 N.W.2d 815, 823 (Minn. 1998)).

Sunrise argues that the reservation letters serve as enforceable contracts because each "reservation letter signals to the developer that it can begin seeking investors and expending the resources necessary to complete the project." Thus, Sunrise asserts that the PUC's actions on August 6 resulted in a taking of the company's cognizable property interests. Xcel counters that the very terms of the reservation letter contradict any interpretation of it as a legally enforceable contract.

We note that the record contains no signed reservation letters. But an unsigned sample reservation letter includes language suggesting that a party's signature and acceptance of the offer contained in the reservation letter pertains to the rate, not the entire project, as Sunrise suggests. For instance, the first paragraph addresses the developer's ability to lock in a rate on the date the reservation letter is signed. The

paragraph concludes, "This is contingent upon approval of the completed photovoltaic project as specified below." The letter also includes the following language: "If there is any conflict with this document and the Solar*Rewards community contract, the terms of the contract control." The letter concludes, "I hereby confirm and accept this Reservation Letter to secure the offer[.]"

In a separate order clarifying the CSG application process, the PUC provided the following feedback on the application process:

> Under Xcel's solar-garden program, developers must apply to the Company for permission to operate a community solar garden. The Company processes solar-garden applications on a "first-ready, first-served" basis to ensure that priority is given to those projects with the best chance of succeeding.
>
> The process begins with a developer submitting an application, including information about itself and the proposed solar garden, an application fee, a deposit, engineering documents, and an interconnection application. Xcel then has 30 days to determine whether the solar-garden application is complete and forward it for engineering review.
>
> After Xcel determines initial application completeness, the developer must submit additional evidence of project readiness, including evidence that the developer has arranged for insurance, evidence that the developer has control of the solar-garden site, projected subscription at the time of construction, and signed operation and interconnection agreements. The developer has 24 months from when Xcel finds its application complete to finish the project, subject to possible extension for interconnection delays.

We conclude that the PUC's interpretation of the application process is consistent with the terms of the reservation letter and that the reservation letter cannot serve as an enforceable contract.

Sunrise maintains that, in the alternative, it should be provided relief under the theory of promissory estoppel because it proceeded in the CSG program with an understanding that the PUC would permit unlimited co-location. Under Minnesota law, the elements of promissory estoppel are (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice. *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn. 1995). "[T]he doctrine of promissory estoppel only applies where no contract exists." *Banbury v. Omnitrition Int'l, Inc.*, 533 N.W.2d 876, 881 (Minn. App. 1995).

It is undisputed that a developer must take further actions after signing and uploading a reservation letter but before the final approval of the CSG project. Some of these actions are bound to result in cost to the developer. But the reservation letters did not serve to promise anything except a locked-in rate and a favorable position in the interconnection queue. Further, Sunrise cannot succeed under this theory absent a conclusion that the PUC engaged in rulemaking. Because we conclude that the PUC did not issue a rule but rather used its express statutory authority to modify Xcel's CSG program in its implementation stages, Sunrise cannot bind the PUC to its statements in order to succeed under a theory of promissory estoppel.

14

*Procedural Due Process*

Sunrise argues that the commission violated Minnesota's open-meeting law on June 25, 2015, when it took a ten-minute break before returning to the public forum to make a decision. The open-meeting law requires, with limited exception, that all meetings of public bodies, including the commission, be open to the public. Minn. Stat. § 13D.01, subd. 1(a)(3) (2014). It is undisputed that the commission was subject to the open-meeting law on that date—it was a "gathering[] of a quorum or more members of the . . . commission thereof, at which members discuss, decide, or receive information as a group on issues relating to the official business of that governing body." *Moberg v. Indep. Sch. Dist. No. 281*, 336 N.W.2d 510, 518 (Minn. 1983). This court must decide (1) whether the commission violated the open-meeting law and, if so, (2) whether a certiorari appeal is the proper vehicle for redress.

During the full-day hearing, the commissioners took several breaks. Immediately before taking its final break, the commission chair stated:

> I suggest we just take a break for ten minutes so that we have a chance to talk to the staff and see whether we can come to any clarity about whether we're going to proceed today or not.
>
> . . . .
>
> . . . So we'll take ten minutes, give the Commissioners a chance to confer with staff, and we'll decide whether we're going today or we're not.

Sunrise takes issue with this because the commissioners returned and immediately voted to adopt the partial settlement's temporary co-location cap after expressing hesitation

15

about limitations earlier in the day. The party alleging a violation of the open-meeting law bears the burden of proving that a "group consensus" was formed outside of the public space. *Franzwa v. City of Hackensack*, 567 F. Supp. 2d 1097, 1115 (D. Minn. 2008); *Moberg*, 336 N.W.2d at 519.

Here, the only evidence proffered by Sunrise that the commissioners violated the open-meeting law is that the commission adopted the co-location cap after the break despite some members expressing concerns about it before the break. This is not evidence that the commissioners conducted a closed "meeting" for purposes of the statute. Immediately before taking the break, the commissioners agreed that a change needed to be implemented but were "a little torn between 5 and 10 (MW's)," noting that "if we go with 5 we're going to have the divestiture argument big time. And if we go with 10, I'm not sure the ratepayer impact isn't too great." The chair suggested they break for ten minutes, noting that "the choices are difficult. . . . [A]re we insufficiently well informed today to make a decision or is it just that we have a hard choice to make? That's what I think we have to try to figure out in the next ten minutes." Another commissioner stated, "No, I agree. That's what I have to know. If I have all the information I can get, I'm ready to make a decision, but I want to know I have the information I need." The chair responded, "All right, so we'll take ten minutes, give the Commissioners a chance to confer with staff, and we'll decide whether we're going today or we're not."

From this, Sunrise asserts that the commissioners arrived at a back-door decision to adopt Xcel's partial settlement terms with regard to the cap. This is not enough

16

evidence to support a conclusion that the commission inappropriately formed a "group consensus" outside the presence of the public. Further, a meeting between a member of a governing body and a non-member generally is not subject to the open-meeting law. *See Minn. Educ. Ass'n v. Bennett*, 321 N.W.2d 395, 398 (Minn. 1982) (holding that a telephone conversation between school superintendent and board member did not violate open-meeting law because superintendent was not entitled to vote and was not member of governing body). Thus, the fact that the commissioners broke with the express purpose of conferring with staff did not violate the open-meeting law, as staff are not voting members of the commission.

Even if the commission did violate the open-meeting law, Minnesota courts have held that such impropriety does not justify invalidation of the commission's actions either partially or in entirety. *See, e.g.*, *Sullivan v. Credit River Township*, 299 Minn. 170, 176-77, 217 N.W.2d 502, 507 (1974); *In re Petitions of D & A Truck Line, Inc.*, 524 N.W.2d 1, 6 (Minn. App. 1994). The sole remedy available in this case is a $300 civil penalty against individual commissioners found to be in violation of the open-meeting law. Minn. Stat. § 13D.06, subd. 1 (2014) ("Any person who intentionally violates this chapter shall be subject to personal liability in the form of a civil penalty in an amount not to exceed $300 for a single occurrence, which may not be paid by the public body."). Sunrise urges this court to vacate the PUC's order, arguing that the "violation of Minnesota's Open Meeting Law renders the PUC's August 6, 2015 Order unlawful and invalid under Minn. Stat. § 14.69." Even if this court were to conclude that the PUC

17

violated the open-meeting law, the solution Sunrise seeks is not one this court is authorized to implement.

### III. INTERCONNECTION RIGHTS

Sunrise argues that the PUC violated the Public Utility Regulatory Policies Act of 1978 (PURPA) by allowing Xcel to refuse interconnection based on upgrade needs if the costs exceed $1 million. PURPA was enacted in late 1978 to address a nationwide energy crisis. *Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 745, 102 S. Ct. 2126, 2130 (1982). PURPA promotes the development of new generating facilities and the conservation of fossil fuels. *New York v. Fed. Energy Regulatory Comm'n*, 535 U.S. 1, 9, 122 S. Ct. 1012, 1019 (2002). The purpose of the act is to "encourage (1) conservation of energy supplied by electric utilities; (2) the optimization of the efficiency of use of facilities and resources by electric utilities; and (3) equitable rates to electric consumers." 16 U.S.C. § 2611 (2012). Congress granted the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over the regulation and sale of electric power at wholesale cost in interstate commerce. *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 494 F. Supp. 2d 401, 406 (M.D. La. 2007). "[T]he FERC . . . promulgate[s] rules to encourage cogeneration and small power production, including rules requiring electric utilities to purchase electricity from, and sell electricity to, QF's." *Id.* PURPA was codified in Minnesota under Minn. Stat. § 216B.164, which enables the PUC to regulate the energy industry and implement PURPA's provisions.

Sunrise maintains that PURPA and Minnesota's implementing statutes do not permit caps as a basis to refuse interconnection. *See* 16 U.S.C. § 2621(d)(15) (2012)

18

("Each electric utility shall make available, upon request, interconnection service to any electric consumer that the electric utility serves."); Minn. Stat. § 216B.164. Because of this mandatory language, Sunrise argues that the PUC's $1 million interconnection cap as a basis for refusal is per se unlawful. Respondents assert that Sunrise's argument is misplaced because (1) the retail rate that developers would receive under the CSG statute is higher than what they would receive under the other solar-production statute for large-scale utility developments, (2) the CSG program forbids a developer from continuing under the statute if it would require Xcel to make a "material upgrade," and (3) the CSG program is an alternative to the section 10 tariff, which allows solar projects to be completed with an aggregate production of 10-MW.

The entirety of Sunrise's PURPA argument rests on the contention that PURPA controls and, therefore, prohibits Xcel from denying a project on the basis of interconnection costs. But the CSG is an alternative program to the section 10 tariff that governs larger utility-scale projects because Minn. Stat. § 216B.164 already offers developers a vehicle for solar development.

We find it persuasive that the FERC recently addressed this question in another jurisdiction. Winding Creek Solar LLC filed a petition for enforcement against the California Public Utilities Commission, arguing that California's alternative-energy program is inconsistent with PURPA because of statewide caps on the obligation of utility companies under the statute. *Winding Creek Solar LLC*, 151 FERC ¶ 61,103 at *1 (2015). The FERC held that

19

as long as a state provides QFs the opportunity to enter into long-term legally enforceable obligations at avoided cost rates, a state may also have alternative programs that QFs and electric utilities may agree to participate in; such alternative programs may limit how many QFs, or the total capacity of QFs, that may participate in the program.

*Id.* at *3. Here, Sunrise provides no evidence that it elected to be governed by PURPA instead of under the CSG statute, and this is likely due to the difference in rates that Sunrise would be subjected to under the different statutes. Sunrise would benefit economically by participating in this state's solar-power initiative through the CSG program rather than through the traditional competitive-bid process. Because the CSG program is an alternative to the statute governing the solar-power competitive-bid process, the PUC may lawfully place limitations on participation, including on interconnection costs, without violating state and federal law.

**Affirmed.**