**MINNESOTA TRANSITIONS CHARTER SCHOOL,**
Relator,

v.

**COMMISSIONER OF THE MINNESOTA DEPARTMENT OF EDUCATION, Respondent.**

**No. A13–1232.**

Court of Appeals of Minnesota.

March 17, 2014.

Minnesota Department of Education Cindy Lavorato, Booth & Lavorato LLC, Minnetonka, MN, for relator.

Lori Swanson, Attorney General, Kathryn M. Woodruff, Assistant Attorney General, St. Paul, MN, for respondent.

Considered and decided by CLEARY, Chief Judge; JOHNSON, Judge; and RODENBERG, Judge.

## OPINION

CLEARY, Chief Judge.

Relator Minnesota Transitions Charter School challenges a decision of the Minnesota Department of Education (MDE) that relator is not eligible to operate its alternative-learning program (ALP) under Minn.Stat. § 123A.05 (2012). On appeal, relator argues that MDE erroneously interpreted section 123A.05, subdivision 1(a), and the related statutory scheme. Additionally, relator argues that MDE's decision constitutes an unpromulgated agency rule, that the decision was not supported by substantial evidence, and that the decision was arbitrary and capricious. We affirm MDE's decision because charter schools are not eligible to operate ALPs under the plain meaning of the statute.

## FACTS

In 2002, MDE sent relator a letter approving relator for an ALP on a probationary basis for one calendar year. The letter indicated that relator "satisfie[d] a sufficient number of the provisions of M.S. 123A.05 (Area Learning Center Organization) and 123A.06 (Center Programs and Services) to approve initial site determination." MDE continued to fund relator's ALP over the next eleven years. E-mails among MDE staff members reflect that MDE began reviewing relator's ALP in the first half of 2011. Discussions regarding the statutory basis for relator's ALP continued at various times over the next two years. In May 2013, MDE notified relator that it appeared relator was not eligible to operate its ALP, and the parties subsequently met to discuss MDE's preliminary findings on June 5, 2013. MDE issued its final decision on June 19, 2013

by letter, stating that relator was not eligible to operate an ALP under section 123A.05. Relator now appeals this determination.

## ISSUES

I. Is MDE's conclusion that charter schools are not eligible to operate alternative-learning programs under section 123A.05, subdivision 1(a), erroneous?

II. Is MDE's decision invalid as an unpromulgated agency rule under the Minnesota Administrative Procedure Act?

III. Did MDE fail to follow statutory requirements for withholding funding from relator?

IV. Is there substantial evidence to support MDE's decision?

V. Is MDE's decision arbitrary and capricious?

## ANALYSIS

On writ of certiorari, we review quasi-judicial agency decisions not subject to the Minnesota Administrative Procedure Act (MAPA) by examining the record "to review questions affecting the jurisdiction of the [agency], the regularity of its proceedings, and, as to the merits of the controversy, whether the order or determination in a particular case was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it." *Anderson v. Comm'r of Health,* 811 N.W.2d 162, 165 (Minn.App.2012), *review denied* (Minn. Apr. 17, 2012) (quotation omitted).

### I.

**A. MDE's interpretation of section 123A.05, subdivision 1(a), corresponds with the plain meaning of the statute.**

Minn.Stat. § 123A.05, subd. 1(a), states that "[a] district may establish an

area learning center, alternative-learning program, or contract alternative in accordance with sections 124D.68, subdivision 3, paragraph (d), and 124D.69." MDE argues that the plain language of section 123A.05, subdivision 1(a), limits the eligibility for ALP operation to school districts and excludes charter schools. Relator asserts that MDE's reading of the statute conflicts with a plain reading of the overall statutory scheme.

■■■ "When a decision turns on the meaning of words in a statute or regulation, a legal question is presented. In considering such questions of law, reviewing courts are not bound by the decision of the agency and need not defer to agency expertise." *St. Otto's Home v. Minn. Dep't of Human Servs.,* 437 N.W.2d 35, 39–40 (Minn.1989) (citation omitted). Questions of statutory construction are reviewed de novo. *Lee v. Fresenius Med. Care, Inc.,* 741 N.W.2d 117, 122 (Minn. 2007). This court "retain[s] the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute." *In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Device Permits,* 664 N.W.2d 1, 7 (Minn.2003).

The goal of this court when interpreting statutes "is to ascertain and effectuate the intention of the legislature." *Brua v. Minn. Joint Underwriting Ass'n,* 778 N.W.2d 294, 300 (Minn.2010) (quotation omitted). If a statute is unambiguous, we interpret the text of a statute according to its plain language. *Id.* If a statute is ambiguous, we employ canons of construction to determine the legislature's intent. *Id.* A statute is ambiguous when it is subject to more than one reasonable interpretation. *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). "Basic canons of statutory construction instruct that we are to construe words and phrases

according to their plain and ordinary meaning." *Id.* "A statute should be interpreted, whenever possible, to give effect to all of its provisions; 'no word, phrase, or sentence should be deemed superfluous, void, or insignificant.'" *Id.* (quoting *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999)). "We are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Id.*

■■ We first must inquire into whether section 123A.05, subdivision 1(a), has a plain and ordinary meaning or is susceptible to more than one reasonable interpretation. Section 123A.05, subdivision 1(a), enables a "district" to establish an ALP. "When interpreting a statute, we generally are guided by the definitions provided by the Legislature." *State v. Rick,* 835 N.W.2d 478, 482 (Minn.2013). For purposes of section 123A.05, subdivision 1(a), "district" is defined in Minn. Stat § 120A.05 (2012). Minn.Stat. § 123A.01, subd. 1 (2012). Section 120A.05 defines "district" as a "school district." Minn.Stat. § 120A.05, subd. 8.

Under a plain reading of section 120A.05, subdivision 8, a charter school is not a "school district" and is therefore not a "district" as defined in that section. The legislature has distinguished school districts from charter schools elsewhere in the education code. *See, e.g.,* Minn.Stat. § 124D.10, subd. 27 (2012) (stating that a charter school may enter into a collaborative agreement with the school district in which it is located to enhance student achievement). Additionally, the legislature has expressly deemed that charter schools be considered districts for purposes of other statutory provisions. *See e.g.,* Minn. Stat. § 124D.10, subd. 8(k) (deeming charter schools to be districts for purposes of tort liability under chapter 466).

Relator argues that, even if charter schools are not districts as defined in section 120A.05, the scope of section 123A.05, subdivision 1(a), does not limit eligibility to operate ALPs to school districts. Instead, relator asserts that the subdivision provides districts the discretion to establish ALPs, but does not prohibit charter schools from also doing so. Relator's reading of the statute is unpersuasive. By authorizing school districts to operate the listed alternative-education programs through subdivision 1(a), the legislature implied that school districts would not otherwise be able to operate alternative-education programs, in the absence of subdivision 1(a). Reading section 123A.05, subdivision 1(a), so that entities not listed are able to operate ALPs makes the subdivision superfluous and of no effect. *See Am. Family Ins. Grp.*, 616 N.W.2d at 277 (stating that "[a] statute should be interpreted, whenever possible, to give effect to all of its provisions"). Entities not listed under subdivision 1(a), including charter schools, are without authorization to operate alternative-education programs under the plain meaning of the subdivision. *See Wallace v. Comm'r of Taxation*, 289 Minn. 220, 230, 184 N.W.2d 588, 594 (1971) (reiterating the established principle that "courts cannot supply that which the legislature purposefully omits or inadvertently overlooks").

■ Under a plain reading of section 123A.05, subdivision 1(a), charter schools are not eligible to operate ALPs. However, we must also review related statutes to determine the meaning of the provision within the entire statutory scheme. *See A.A.A. v. Minn. Dept. of Human Servs.*, 818 N.W.2d 552, 556 (Minn.App.2012) (stating that this court "review[s] a statute's content to discern meaning in the full context of the act or provision and consider[s] sections of a statute that relate to the same subject matter"), *review granted* (Minn. Sept. 25, 2012).

MDE argues that relator's reading of the statutory scheme runs contrary to the clear intent of the legislature. Specifically, MDE cites flexible-learning-year programs, online-learning programs, and the freedom that charter schools are given from the standard school-year calendar, all as evidence that the legislature has been clear as to what alternative-education programming charter schools may offer. MDE also points to the statutory section authorizing charter-school formation, the lack of a cross-reference to section 123A.05, subdivision 1(a) in that section, and a provision in that section limiting the automatic application to charter schools of the statutes and rules applicable to school districts. *See* Minn.Stat. § 124D.10 (2012). Lastly, MDE argues that the legislature's recent elimination of grade-acceleration programming for charter schools evidences a legislative intent to limit charter-school eligibility for alternative-education-program funding. *See* 2013 Minn. Laws ch. 116, art. 1, § 13.

Flexible-learning-year programs are outlined in Minn.Stat. §§ 124D.12–.127 (2012). The statutory sections that outline flexible-learning-year programs do not cross-reference the charter school statute and do not directly reference charter schools. *See* Minn.Stat. §§ 124D.12–.127. Instead, as with section 123A.05, subdivision 1(a), the flexible-learning-year program sections "*authorize districts* to evaluate, plan and employ the use of flexible learning year programs." Minn.Stat. § 124D.12 (emphasis added). However, support for the applicability of these provisions to charter schools is found in the charter-school statute. *See* Minn.Stat. § 124D.10, subd. 13 (stating that a charter school "may provide instruction throughout the year according to sections 124D.12

to 124D.127 or 124D.128"). Support for charter-school eligibility to offer online courses is in the express language of the statutory section addressing online-learning options for all public schools *and* in the charter school law. *See* Minn.Stat. § 124D.095 (2012) (containing a number of subdivisions which explicitly mention charter schools, including subdivision 2(d), which incorporates charter schools in defining "Online learning provider"); Minn. Stat. § 124D.10, subd. 8(n) (2012) (directing that "[a] charter school offering online courses or programs must comply with sections 124D.095").

The statutory scheme for flexible-learning-year programs provides some support for MDE's reading of the statutory scheme. As with section 123A.05, subdivision 1(a), the flexible-learning-year program sections do not cross-reference the charter school statute, expressly include charter schools, or incorporate charter schools within the definition of district. *See* Minn.Stat. §§ 124D.12–.127. However, unlike section 123A.05, subdivision 1(a), the flexible-learning-year program sections are cross-referenced in the charter-school statute, providing explicit authority for their applicability to charter schools. Similarly, online-learning programs are cross-referenced in the charter-school statute. Minn.Stat. § 124D.10, subd. 8(n). This suggests that, having omitted a specific cross-reference in the charter-school law, the legislature did not intend the ALP provision to apply to charter schools.

MDE further urges that the ALP provision should be read in light of Minn.Stat. § 124D.10, subd. 7. The subdivision reads in part, "A charter school is exempt from all statutes and rules applicable to a school, school board, or school district unless a statute or rule is made specifically applicable to a charter school or is included in this section." Minn.Stat. § 124D.10,

subd. 7. Relator argues that subdivision 7 does not prevent a charter school from voluntarily complying with statutes and rules applicable to school districts.

The application of subdivision 7 turns on the scope of "exempt." *Black's Law Dictionary,* 653 (9th ed.2009), defines "exempt" as "[f]ree or released from a duty or liability to which others are held." *See Goodman v. Best Buy, Inc.,* 777 N.W.2d 755, 759 n. 2 (Minn.2010) (approving the use of *Black's Law Dictionary* when conducting a plain-meaning reading of a statute). This indicates that subdivision 7 should only be read to prohibit duties and liabilities imposed on schools, school boards, and school districts from automatically applying to charter schools. This would not exclude eligibility for program funding and operation, which is a benefit and not a duty or liability. Such a reading is corroborated by subdivision 8 of the same section, which lists the duties and obligations that do apply to charter schools. Minn.Stat. § 124D.10, subd. 8. The plain meaning of subdivision 7 does not prohibit charter school eligibility for ALPs under Minn.Stat. § 123A.05, subd. 1(a).

MDE's last argument is that a recent elimination of grade-acceleration programs under Minn.Stat. § 124D.128 (Supp.2013) evidences a legislative intent to limit charter-school eligibility for alternative-education-program funding. In 2013, the legislature eliminated language in section 124D.128, subdivision 2, related to grade-level-acceleration programs. 2013 Minn. Laws ch. 116, art. 1, § 13 (eliminating language which stated in part that "[a] school district or charter school may be approved biennially by the state to provide additional instructional programming that results in grade level acceleration"). The 2013 legislative change to section 124D.128 does not shed any light on the plain mean-

ing of section 123A.05, subdivision 1(a). The language in section 123A.05, subdivision 1(a), was untouched by the legislature in 2013, and there is no reason that the change to an unrelated section has any bearing on the legislative intent of section 123A.05, subdivision 1(a).

Relator argues that charter schools are eligible to operate ALPs when section 123A.05, subdivision 1(a), is read in conjunction with Minn.Stat. § 124D.11, subds. 1(a), 6(a) (2012). Section 124D.11, subdivision 1(a), states that "[g]eneral education revenue must be paid to a charter school as though it were a district." The subdivision further contains a formula that is to be employed in calculating general-education revenue. Minn.Stat. § 124D.11, subd. 1(a). Relator asserts that, based on this provision, a charter school must be given the same funding as would a traditional school district. Section 124D.11, subdivision 6(a), directs that "[a] charter school is eligible to receive other aids, grants, and revenue according to chapters 120A to 129C, as though it were a district." Relator maintains that the cross-reference to sections 120A through 129C, which includes the ALP provision in section 123A.05, subdivision 1(a), grants a charter school eligibility to operate and receive funding for an ALP "as though it were a district."

Relator's reading of section 124D.11, subdivisions 1(a) and 6(a), is overly broad. Chapters 120A through 129 encompass the entirety of the education code. General-education revenue is similarly broad in scope. Under relator's interpretation of these subdivisions, charter schools are authorized to operate and receive funding for every program outlined in the education code available to districts, without any direct authorization in specific statutory pro-

visions. Such a reading would make the provision authorizing charter schools to operate flexible-learning-year programs and the language including charter schools in the online-learning program provisions superfluous. These specific provisions would not be necessary, since authority for charter-school eligibility would already be predicated on subdivision 1(a) or 6(a) of section 124D.11.[1] We are directed to interpret the statutory scheme to give effect to all provisions. *Am. Family Ins. Grp.*, 616 N.W.2d at 277. The correct reading of subdivision 1(a) and 6(a), in the context of the statutory scheme, is that they authorize charter schools to receive funding as though they were school districts when specific statutory authorization otherwise exists for charter schools to operate a certain program.

Taking the statutory scheme as a whole, the plain meaning of section 123A.05, subdivision 1(a), is that charter schools are not eligible to operate ALPs. As previously discussed, the statutorily provided definition of "district" does not include charter schools. *See* Minn.Stat. §§ 120A.05, subd. 8, 123A.01, subd. 1. We do not read section 124D.11, subdivisions 1(a) and 6(a), as authorizing charter schools to operate any program for which school districts are authorized. For these reasons, we uphold MDE's decision interpreting section 123A.05, subdivision 1(a), as not authorizing charter schools to operate ALPs.

**B. Even if section 123A.05, subdivision 1(a), is ambiguous, MDE's interpretation is reasonable.**

▮ Although we conclude that section 123A.05, subdivision 1(a), unambiguously excludes charter schools from operating ALPs, we would affirm MDE's

1. Section 124D.10, subdivision 13, and subdivisions 1(a) and 6(a) of section 124D.11, were both enacted in the 1991 legislative session. 1991 Minn. Laws ch. 265, art. 9, §§ 3, 43.

interpretation even if the statute were subject to more than one reasonable interpretation. A statute is ambiguous when subject to more than one reasonable interpretation. *Am. Family Ins. Grp.*, 616 N.W.2d at 277. "[W]hen a statute is ambiguous, we give deference to the administrative interpretation of the relevant statute by a state agency if the agency is charged with the responsibility of applying the statute on a statewide basis and its interpretation is reasonable." *A.A.A. v. Minn. Dep't of Human Servs.*, 832 N.W.2d 816, 823 (Minn.2013). Additionally, "when the meaning of a statute is doubtful, courts should give great weight to a construction placed upon it by the Department charged with its administration." *Mammenga v. State Dep't of Human Servs.*, 442 N.W.2d 786, 792 (Minn.1989) (quotation omitted). The commissioner of education is responsible for administering education laws statewide. Minn.Stat. § 127A.05 (2012). Relator asserts that MDE's interpretation of the ALP provision is not reasonable. For support, relator cites *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35 (Minn.1989).

*St. Otto's Home* was an appeal from a contested case involving a Minnesota Department of Human Services (DHS) determination that relators were not "hospital-attached nursing homes" under an administrative rule that DHS had promulgated. 437 N.W.2d at 36. Since 1972, DHS rules had given preferential rate treatment to hospital-attached nursing homes. *Id.* at 38. In 1985, a permanent rule became effective changing some of the language in the old rule defining hospital-attached nursing homes, but otherwise remaining the same. *Id.* at 38–39. After the new rule was promulgated, DHS denied relators' claims for hospital-attached status. *Id.* at 39. Both the old and new rule

contained a common-operation requirement for hospital-attached status. *Id.* at 41. Under the new rule, DHS had concluded that relators did not meet this requirement, even though the relevant language had not changed. *Id.* The court first determined that "[i]f a regulation is ambiguous, agency interpretation will generally be upheld if it is reasonable." *Id.* at 40. After holding that the meaning of "common operation" was ambiguous, the court reviewed whether DHS's definition was reasonable. *Id.* at 41. In concluding that the DHS definition was unreasonable, the court stated that, after the rule was amended, DHS failed to indicate to relators that "common operation" would be given "such a restrictive definition" as to exclude them. *Id.*

Concerning an additional requirement that costs must be shared, the court concluded that relators "met the literal requirements of the rule" and there was no indication that the new requirement DHS was imposing on the definition of "costs" would be required from the face of the rule. *Id.* Additionally, DHS failed to provide language sufficient to warn relators that their current practices would no longer meet the new rule. *Id.* Addressing a final term at issue, the court concluded that DHS's interpretation conflicted with the clear and unambiguous language of the rule and required supplying language DHS had either purposefully omitted or inadvertently overlooked. *Id.* at 42.

Here, relator asserts that MDE has departed from its past interpretation of "district" and an over ten-year history of approving relator's program. It also argues that MDE's decision was "unfair and unreasonable" under *St. Otto's Home*. Relator's reliance on *St. Otto's Home* is misplaced. MDE has provided funding to relator for an ALP since 2001. As was true of the relevant language in *St. Otto's*

*Home,* no change occurred in the language of section 123A.05, subdivision 1(a), yet MDE has now determined that charter schools do not qualify for an ALP under the unchanged language. In *St. Otto's Home,* DHS changed its interpretation of agency-crafted language that was not explicitly defined. Here, MDE changed positions on relator's eligibility to operate an ALP based on language the legislature crafted and not language that MDE crafted. The concern the court had in *St. Otto's Home*—that upholding the agency decision required supplying language to the rule that the agency had failed to include—is not present here with regard to MDE's interpretation of the statute.

Additionally, the possibility that charter schools might not be eligible to operate ALPs is readily apparent from the face of the statute. Because charter schools are not mentioned in section 123A.05, subdivision 1(a), or the surrounding sections, the relevant language does, at minimum, indicate that there is a possibility MDE might interpret the provision to exclude charter schools. Further, the court in *St. Otto's Home* seems to have been concerned with the lack of notice given to relators. *See* 437 N.W.2d at 41 (describing DHS as acting "without any explanation or warning" and "fail[ing] to give any indication to the nursing homes" that a restrictive definition would be given to the relevant language). It appears that, with notice, the nursing homes could have met the DHS interpretation of the relevant language. *See id.* at 41 (stating that DHS's interpretation would require relators to submit a combined-cost report). Here, notice would not have provided relator with the ability to meet the eligibility requirements. Relator is a charter school, and there is nothing to indicate that relator could have converted itself into a school district to be eligible under the statute.

Relator also argues that canons of statutory construction dictate that MDE's interpretation of the ALP provision is erroneous and unreasonable. "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012). Relator relies on information in a report produced by the Office of the Legislative Auditor (OLA) to conclude that the origins of alternative-education programs support relator's interpretation. The OLA report states that alternative-learning programs began in 1987 "to serve high school students struggling in traditional schools." Minnesota Office of the Legislative Auditor, *Evaluation Report: Alternative Education Programs* 9 (Feb.2010) *available at* http://www.auditor.leg.state. mn.us/ped/pedrep/alted.pdf. According to the report, the high school graduation incentive program was established for a similar purpose. *Id.* Relator also cites section 124D.68, subdivision 2, which lists students eligible to enroll in alternative-education programs. *See* Minn.Stat. § 124D.68, subd. 3 (stating that pupils eligible under subdivision 2 may enroll in alternative-education programs under sections 123A.05–.08). Relator asserts that the program focus of state-approved alternative-education programs also supports charter-school eligibility for ALPs. *See* Minn.Stat. § 123A.06, subd. 1(a) (providing that alternative programs "must focus on academic and learning skills, applied learning opportunities, trade and vocational skills, work-based learning opportunities, work experience, youth service to the community, transition services, and English language and literacy programs for children whose primary language is a language other than English").

None of these arguments are persuasive. That alternative-education programs began by helping students struggling in traditional schools does not necessarily compel the conclusion that the legislature

intended charter schools to operate the programs. Relator does not identify, and it is not apparent from reading the cited sections, what specific language in section 124D.68 or section 123A.06 reflects that the legislature intended that alternative-education programs would be offered by charter schools.

Relator also cites a provision in the charter-school law addressing admission requirements. The provision directs that "[a] charter school may limit admission to . . . pupils who are eligible to participate in the graduation incentives program under section 124D.68." Minn.Stat. § 124D.10, subd. 9(a)(2). As previously stated, section 124D.68, subdivision 2, identifies the students who are eligible to participate in the alternative-education programs of section 123A.05. Because charter schools may limit enrollment to students eligible for alternative-education programming, relator asserts that the legislature intended charter schools to offer alternative-education programs. Yet, allowing charter schools to limit enrollment to students eligible for alternative-education programming could also reasonably be interpreted to mean that the legislature intended a charter school to be its own form of alternative education, separate from alternative-education programs offered by districts. Additionally, MDE's interpretation of section 123A.05, subdivision 1(a), does not prevent students enrolled in charter schools from seeking alternative-education programs offered by school districts.

Relator has not presented persuasive evidence that, even if there were any ambiguity in the statutory scheme, it should be resolved in relator's favor. We must also consider the weight that should be given to MDE's interpretation as an "agency charged with the responsibility of applying the statute on a statewide basis." *A.A.A.*, 832 N.W.2d at 823. In light of these concerns, we conclude that MDE's interpretation of section 123A.06, subdivision 1(a), is reasonable.

## II.

Relator argues that MDE's denial of relator's eligibility to operate an ALP constituted an unpromulgated rule and should be invalidated. Administrative agency authority to adopt administrative rules is governed by MAPA. *See* Minn. Stat. §§ 14.001–.69 (2012). MAPA requires that administrative rules be promulgated after giving public notice and providing interested persons the opportunity to be heard. *See* Minn.Stat. §§ 14.14, .22 (providing procedures for promulgation of rules with and without public hearing). Under MAPA, a rule is defined as "every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by that agency or to govern its organization." Minn.Stat. § 14.02, subd. 4. An agency must promulgate legislative rules and interpretive rules. *In re PERA*, 820 N.W.2d 563, 570 (Minn.App.2012). Legislative rules are those "promulgated pursuant to delegated powers to make substantive law." *Id.* (quotation omitted). Interpretive rules are those that "make specific the law enforced or administered by the agency." *Id.* (quotation omitted). An unpromulgated interpretive rule is still valid "if the agency's interpretation of a [statute] corresponds with its plain meaning, or if the [statute] is ambiguous and the agency interpretation is a longstanding one." *Id.* (quoting *Cable Commc'ns Bd. v. Nor–West Cable Commc'ns P'ship*, 356 N.W.2d 658, 667 (Minn.1984)) (quotation marks omitted). Although an unpromulgated interpretive rule falling within one of the exceptions is valid, "the agency is not deemed to have promulgated a new rule" and the

agency's decision "does not have the force and effect of law." *Id.* (quoting *Good Neighbor Care Ctrs., Inc. v. Minn. Dep't of Human Servs.*, 428 N.W.2d 397, 402–03 (Minn.App.1988), *review denied* (Minn. Oct. 19, 1988)) (internal quotation marks omitted). If an agency's interpretation of a statute is not properly promulgated and is not within an exception, it is invalid. *Id.*

Relator asserts that MDE has issued a new definition of "district" and a new interpretation of section 123A.05, subdivision 1(a), and has therefore issued an unpromulgated interpretive rule. MDE's letter declared that charter schools are not eligible to offer ALPs under section 123A.05, subdivision 1(a). This constitutes a "statement of general applicability and future effect." *See* Minn.Stat. § 14.02, subd. 4 (defining "rule" to include a "statement of general applicability and future effect"). Furthermore, MDE's decision is an interpretive rule as it involved specifically identifying the entities that are eligible and ineligible to operate ALPs under the statute. Moreover, MDE's interpretation of section 123A.05, subdivision 1(a), corresponds with the plain meaning of the statute. The decision is valid under the exception for plain-meaning interpretations. MDE is not deemed to have promulgated a new rule, and, although the decision is valid, the decision does not have the force and effect of law.

### III.

Next, relator asserts that MDE failed to follow learning-year-program procedures set forth in Minn.Stat. § 124D.128, subd. 6a (2012). Section 124D.128, subdivision 6a(a), specifies the process MDE must follow "[i]f, during an audit of a district's learning year program, the commissioner finds that the district is not meeting program requirements." MDE responds that the process outlined in section 124D.128,

subdivision 6a, is designed to "address noncompliance in day-to-day learning year program operations."

Relator's argument is unpersuasive. Section 124D.128, subdivision 6a(a), states that "notice must specify the findings in detail, describe the correction required, *set a reasonable time during which the findings should be corrected*, and advise that general education revenue to the district may be reduced." (Emphasis added.) MDE did not find that relator is not meeting program requirements. Instead, MDE found that relator is ineligible to operate an ALP. Relator asserts that the statutory process is meant to require MDE to specify the reasons for non-compliance and give school boards notice and an opportunity to correct identified deficiencies. Here, MDE specified the reason for non-compliance: relator may not operate an ALP under the express terms of the statute. An opportunity to correct a deficiency is neither applicable nor warranted in the present circumstances.

### IV.

Relator argues that MDE's decision that relator may not operate an ALP is not supported by substantial evidence. An agency must base its decisions on "objective criteria applied to the facts and circumstances of the record at hand. Agency discretion is not unlimited and must be explained." *Carter v. Olmsted Cnty. Hous. & Redevelopment Auth.*, 574 N.W.2d 725, 729 (Minn.App.1998) (quotation omitted). Agency decisions must be supported by substantial evidence, "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 730 (quotation omitted). "On appeal, the appellant must demonstrate that the administrative agency's findings are not supported by the record when considered in its entirety, and

this court applies an abuse of discretion standard." *Id.*

Relator does not describe what additional evidence MDE should have considered. The decision was based entirely on an interpretation of the controlling statute and whether relator's status as a charter school made it ineligible for ALP funding. There was substantial evidence supporting MDE's decision.

## V.

 Relator's final argument is that MDE's decision was arbitrary and capricious. An agency decision is arbitrary and capricious

if the agency relied on factors which the legislature had not intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Trout Unlimited, Inc. v. Minn. Dep't of Agric.*, 528 N.W.2d 903, 907 (Minn.App. 1995), *review denied* (Minn. Apr. 27, 1995). Additionally, an agency decision is arbitrary and capricious when "its determination represents its will and not its judgment." *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 342 N.W.2d 348, 351 (Minn.App.1983).

Relator asserts that MDE's decision was arbitrary and capricious because the June 2013 letter did not detail new evidence supporting the agency changing its interpretation of section 123A.05, subdivision 1(a). Additionally, relator argues that MDE's reasoning was implausible and that MDE failed to consider important facts in the record. Relator claims that MDE now attempts to rationalize its decision in retrospect.

 At oral argument, counsel for MDE conceded that the initial decision to fund relator's ALP was a mistake, and that the decision should have been corrected much earlier than June 2013. MDE has not provided any reason for the continued funding of relator's program for approximately ten years. Although MDE's failure to recognize its mistake constitutes unfortunate error, we cannot recognize the correction of their error as arbitrary and capricious. MDE's present interpretation of section 123A.05, subdivision 1(a), corresponds with the statute's plain meaning. An agency must be allowed to correct past errors and adopt a course of action that corresponds to the controlling statute's plain meaning. To prevent MDE from doing so would amount to revision of the statute. *See Martinco v. Hastings,* 265 Minn. 490, 497, 122 N.W.2d 631, 638 (1963) (stating that "[i]f there is to be a change in [a] statute, it must come from the legislature" and not the courts). For these reasons, MDE's decision was not arbitrary and capricious.

## DECISION

Because charter schools are not eligible to operate ALPs under section 123A.05, subdivision 1(a), and the surrounding statutory scheme, we affirm MDE's decision denying relator eligibility to operate its ALP. MDE's interpretation of the statute corresponds with its plain meaning. Therefore, the decision is not invalid as an improperly promulgated rule, is supported by substantial evidence, and is not arbitrary and capricious.

**Affirmed.**