*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-0430**

In the Matter of the Appeal by Kehinde Yusuf and
Caring for Adults of the Order of License Revocation of the
Adult Foster Care and Home and Community-Based Services Licenses.

**Filed November 18, 2024**
**Affirmed**
**Larson, Judge**

Minnesota Department of Human Services
File No. 23-1800-38774

Jason Steck, Law Office of Jason Steck, St. Paul, Minnesota (for relators Kehinde Yusuf
and Caring for Adults)

Keith Ellison, Attorney General, Drew Bredeson, Assistant Attorney General, St. Paul,
Minnesota (for respondent Minnesota Department of Human Services)

Brian J. Melton, Clay County Attorney, Kathleen M. Stock, Assistant County Attorney,
Moorhead, Minnesota (for respondent Clay County)

        Considered and decided by Larson, Presiding Judge; Worke, Judge; and Bjorkman,

Judge.

**NONPRECEDENTIAL OPINION**

**LARSON**, Judge

        In this certiorari appeal, relators Kehinde Yusuf and Caring for Adults challenge

respondent Minnesota Department of Human Services' (DHS) order revoking their family-

adult-foster-care license. Relators argue DHS made legal errors when it determined the

family-adult-foster-care home was not Yusuf's "primary residence" and issued an arbitrary

and capricious decision. Because the record does not show that DHS legally erred or acted arbitrarily or capriciously when it revoked relators' license, we affirm.

## FACTS

In 2016, relators received licenses to operate a family-adult-foster-care home and provide home and community-based services (HCBS) at a residence Yusuf rented in Moorhead, Minnesota (the foster-care home). To qualify for a family-adult-foster-care license, the foster-care home was required to be Yusuf's "primary residence."[1] *See* Minn. Stat. § 245A.03, subd. 7(a) (Supp. 2023).[2] DHS issued a guidance document that lists some of the factors DHS may consider when deciding whether a family-adult-foster-care home is the licensee's "primary residence" (the guidance document). The guidance document provides:

> The home in which the adult foster care services are provided must be the primary residence of the applicant for a family adult foster care license. Factors to consider in determining primary residence of an applicant may include any of the following:
>
> - What is the address on their driver's license/state ID?
> - Where do they live and sleep the majority of the time?
> - Where do they spend time with other immediate family members?
> - Where do they have their clothing and personal objects? Having a bedroom, some clothing and some personal

---

[1] The "primary residence" requirement only applies to "family" adult-foster-care licenses, the type of license DHS issued to relators. *See* Minn. Stat. § 245A.03, subd. 7(a). The statute does not have a similar requirement for "corporate" adult-foster-care licenses. *See id.*

[2] The 2024 amendments made to Minn. Stat. § 245A.03, subd. 7, do not impact the outcome of this case. *See* 2024 Minn. Laws ch. 80, art. 2, § 37, at 193-95; 2024 Minn. Laws ch. 85, § 53, at 381-83; 2024 Minn. Laws ch. 115, art. 18, § 11, at 1382-84; 2024 Minn. Laws ch. 125, art. 1, § 4, at 1957-59; 2024 Minn. Laws ch. 127, art. 46, § 4, at 2636-37.

effects in a home, does not necessarily indicate that it is their primary residence.

- What is their primary residence as indicated on their tax return?
- Where do they receive their mail?
- Where are they registered to vote?
- What is their homestead status with the county assessor's office?
- Who owns the home as indicated on property tax records?
- If the applicant owns more than one home, where do they spend more of their time? Ownership of a home in and of itself, does not indicate primary residence.
- If the home is a duplex, where do they sleep and spend more of their time?
- If the applicant is married, what is the status of the current relationship? For example, is it reasonable that a married couple would live in two separate dwellings?

In November 2021, an HCBS licensor conducted a license review and made observations suggesting the foster-care home was not Yusuf's primary residence, including: (1) the foster-care home had a sterile environment with nothing on the walls other than instructional and facility signs; (2) the bathroom had basic cleaning supplies and no personal toiletries; (3) the closet in Yusuf's bedroom had roughly five articles of clothing and a small suitcase; and (4) Yusuf's bed and desk were covered with boxes, office items, and cleaning supplies that appeared to have been unmoved for a while. The HCBS licensor relayed these concerns to Clay County (the county). The county subsequently sent a letter to all family-adult-foster-care licensees in January 2022, which included a reminder about the primary-residence requirement.

In March 2022, DHS requested that the county follow-up on relators' license review. Through its investigation, the county discovered Yusuf's vehicle registration listed

3

an apartment other than the foster-care home. When a county licensor visited the address listed on Yusuf's vehicle registration, she observed that Yusuf's name appeared on the door buzzer and in the apartment directory as a current resident.

The county licensor then made two unannounced visits to the foster-care home in March 2022, the first at 7:45 a.m. one day and the second the following night at 10:16 p.m. Yusuf was not present at either visit. The resident was present during the first visit and allowed the county licensor into the foster-care home. The resident informed the county licensor that Yusuf did not stay in the foster-care home most overnights. While inside, the county licensor made similar observations to the HCBS licensor, including multiple instructional signs on the walls, the absence of personalized decorations, a lack of personal hygiene products in the bathroom, a few articles of clothing in Yusuf's closet, and it did not appear Yusuf had recently slept in his bed.

Following an announced third visit to the foster-care home the next morning, the county licensor recommended DHS revoke relators' family-adult-foster-care license on the basis that the foster-care home was not Yusuf's primary residence. In September 2022, DHS issued an order revoking relators' family-adult-foster-care license.[3] The revocation order stated, in relevant part, that relators had failed to comply with the licensing requirement that the foster-care home be Yusuf's primary residence.

Relators appealed the revocation order, and an administrative-law judge (ALJ) held a contested-case hearing in May 2023. At the contested-case hearing, DHS called multiple

---

[3] DHS also revoked relators' HCBS license for failure to comply with separate licensing requirements. Relators do not challenge DHS's decision to revoke their HCBS license.

4

witnesses who testified to the facts described above. DHS also elicited testimony explaining why the primary-residence requirement is in the best interest of residents. Specifically, a DHS employee testified that risks to physical health are presented when a resident lives alone, and it can harm a resident's physiological health when they are "not receiving potential supervision or care that they need or the companionship that one would expect in a family adult foster home." Relators offered several documents into the record to support their claim that the foster-care home was Yusuf's primary residence, including bills addressed to Yusuf at the foster-care home, Yusuf's current driver's license issued in April 2022, photos of Yusuf's closet at the foster-care home, and letters supporting Yusuf's position that the foster-care home was his primary residence. Relators also called multiple witnesses, including a former case manager, a former county licensor, a neighbor/landlord, and Yusuf.

Following the contested-case hearing, the ALJ issued a report and recommendation, recommending that DHS find the foster-care home was not Yusuf's primary residence and that DHS revoke relators' family-adult-foster-care license. In doing so, the ALJ acknowledged the guidance document, but analyzed the specific facts and evidence presented at the contested-case hearing. The parties submitted exceptions to the ALJ's report, and, in February 2024, DHS adopted the ALJ's report and recommendation in its entirety.

Relators appeal.

5

**DECISION**

Relators challenge DHS's decision to revoke their family-adult-foster-care license on two grounds: (1) DHS made legal errors when it issued its decision and (2) DHS issued an arbitrary and capricious decision. We apply the Minnesota Administrative Procedure Act, Minn. Stat. §§ 14.001-.69 (2022), to review an administrative decision after a contested-case hearing. *See Eneh v. Minn. Dep't of Health*, 906 N.W.2d 611, 613-14 (Minn. App. 2018). In a certiorari appeal, we may reverse or modify an agency's decision:

> if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or
> (e) unsupported by substantial evidence in view of the entire record as submitted; or
> (f) arbitrary or capricious.

Minn. Stat. § 14.69. An agency's decision enjoys "a presumption of correctness." *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance*, 731 N.W.2d 502, 513 (Minn. 2007) (quotation omitted). "[T]he party challenging the [agency's] decision" bears the burden "to show that the decision should be reversed." *See Fish v. Comm'r of Minn. Dep't of Hum. Servs.*, 748 N.W.2d 360, 363 (Minn. App. 2008).

We review relators' arguments in turn.

**I.**

We first address relators' legal arguments. Relators assert that DHS made two legal errors when it issued its decision. First, relators claim DHS did not have statutory authority

6

to decide whether the foster-care home was Yusuf's "primary residence" because DHS has never engaged in rulemaking to define the phrase. Second, relators argue that DHS legally erred when it relied on the guidance document to evaluate whether the foster-care home was Yusuf's primary residence. We review legal questions de novo. *Kind Heart Daycare, Inc. v. Comm'r of Hum. Servs.*, 905 N.W.2d 1, 9 (Minn. 2017).

We observe that relators failed to raise these legal issues during the administrative process and, therefore, the issues are forfeited. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). But even if relators had properly raised these issues, their arguments would fail for two reasons.

First, DHS has authority to—and in fact must—decide whether a family-adult-foster-care home is the licensee's primary residence. Under Minn. Stat. § 245A.03, subd. 7(a):

> The commissioner shall not issue an initial license for . . . adult foster care . . . for a physical location that will not be the primary residence of the license holder for the entire period of licensure. If a . . . family adult foster care home license is issued during this moratorium, and the license holder changes the license holder's primary residence away from the physical location of the foster care license, the commissioner *shall revoke the license* . . . .[4]

(Emphasis added); *see also* Minn. Stat. § 645.44, subd. 16 (2022) (specifying "'[s]hall' is mandatory"). When a controlling statute's plain meaning expressly requires an action, preventing an agency from carrying out that action "would amount to revision of the

---

[4] Under section 245A.03, "[c]ommissioner means the commissioner of human services or the commissioner's designated representative including county agencies and private agencies." Minn. Stat. § 245A.02, subd. 5.

statute." *Minn. Transitions Charter Sch. v. Comm'r of Minn. Dep't of Educ.*, 844 N.W.2d 223, 235 (Minn. App. 2014), *rev. denied* (Minn. May 28, 2014). And in the absence of rulemaking, an agency enforces a statute using case-by-case decisionmaking. *See L & D Trucking v. Minn. Dep't of Transp.*, 600 N.W.2d 734, 737 (Minn. App. 1999) (noting that, even in the absence of a valid rule, it would be an absurd result to preclude an agency from enforcing a statute on a case-by-case basis), *rev. denied* (Minn. Dec. 21, 1999).

Here, even though DHS has not engaged in rulemaking to define the phrase "primary residence," it still has the duty to enforce a statute on a case-by-case basis. *In re Hibbing Taconite Co.*, 431 N.W.2d 885, 894 (Minn. App. 1988) (noting an "agency has discretion to decide" whether to "formulate policy by promulgating rules or by case by case determinations"). Therefore, because Minn. Stat. § 245A.03, subd. 7(a), mandates that DHS revoke a license if the licensee fails to comply with the primary-residence requirement, relators' argument that DHS lacks the authority to enforce the statute in the absence of rulemaking fails.

Second, the parties appear to agree that the phrase "primary residence" means a licensee's "principal dwelling" or the place the licensee "chiefly resides." But relators contend that DHS misapplied the plain language when it referenced the factors in the guidance document. Upon reviewing the report and recommendation, which DHS adopted, we conclude that DHS did not tie its analysis to the guidance document. Instead, DHS undertook a case-by-case, fact-specific analysis to fulfill its statutory responsibility to

8

evaluate whether the foster-care home was Yusuf's primary residence.[5]  *See Hibbing Taconite Co.*, 431 N.W.2d at 894.  Therefore, we are not persuaded by relators' second argument.

For these reasons, we conclude DHS did not legally err when it revoked relators' license.

**II.**

Relators argue DHS issued an arbitrary and capricious decision when it revoked relators' license because DHS: (1) applied the guidance document inconsistently; (2) failed to consider the well-being of the foster-care home's resident; and (3) issued a biased decision.  "An agency decision is arbitrary and capricious if it is an exercise of the agency's will, rather than its judgment, or if the decision is based on whim or is devoid of articulated reasons."  *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 565 (Minn. App. 2001), *rev. denied* (Minn. Nov. 13, 2001).  An agency engages in arbitrary and capricious decisionmaking if it (1) relies "on factors not intended by the legislature"; (2) entirely fails "to consider an important aspect of the problem"; (3) offers "an explanation that runs counter to the evidence"; or (4) "the decision is so implausible that it could not be explained

---

[5] Because DHS undertook a case-by-case analysis here, we need not decide whether the guidance document is an unpromulgated rule.  *See* Minn. Stat. § 14.381, subd. 1; *In re Shakopee Mdewakanton Sioux Cmty.*, 988 N.W.2d 135, 144 (Minn. App. 2023).  We acknowledge that we currently have a matter pending before our court (A24-1562) challenging an ALJ's decision that DHS has not enforced an unpromulgated rule through the guidance document. *See In re Minn. Assoc. of Residential Servs.*, OAH 22-1800-39881, 2024 WL 3696565 (Minn. Off. Admin. Hrgs. Aug. 1, 2024).  Nothing in this decision shall be construed as expressing an opinion on the merits of the issues raised in that appeal.

as a difference in view or the result of the agency's expertise." *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006).

Beginning with relators' argument that DHS has applied the guidance document inconsistently, relators do not point to any evidence in the record to support their claim. Instead, they rely on an ALJ decision in a different matter that found DHS was "not consistent with how it has addressed licensees with *similar* violations." *See In re Abdulle*, OAH 82-1800-39249, 2024 WL 2837071, at *13 (Minn. Off. Admin. Hrgs. May 28, 2024) (emphasis added).[6] But in *Abdulle*, the licensee argued that DHS was inconsistent because, in cases cited to the ALJ, DHS had "applied progressive sanctions rather than immediately moving to revocation." *Id.* In contrast here, Yusuf does not point to any cases to support his contention that DHS made a "sudden decision to develop and aggressively enforce its own definition of 'primary residence.'" *See Schoepke v. Alexander Smith & Sons Carpet Co.*, 187 N.W.2d 133, 135 (Minn. 1971) ("An assignment of error based on mere assertion and not supported by any argument or authorit[y] is waived . . . unless prejudicial error is obvious on mere inspection."). Therefore, because Yusuf's argument is supported by neither evidence nor caselaw, relators failed to adequately support their claim. *See Fish*, 748 N.W.2d at 363 (explaining that party challenging decision has burden of proving it was arbitrary and capricious).

Regarding relators' contention that DHS engaged in arbitrary and capricious decisionmaking because it failed to consider the wellbeing of the resident, the record belies

---

[6] *Abdulle* is a nonprecedential, office-of-administrative-hearings decision and is not binding authority on our court.

relators' argument. At the contested-case hearing, DHS elicited testimony about the importance of the primary-residence requirement for the wellbeing of the resident. The record shows that a licensee failing to live with a resident presents a risk to the resident's safety and potential harm to the resident's physiological health when they are "not receiving . . . care that they need or the companionship that one would expect in a family adult foster home." And even if DHS had failed to assess the resident's wellbeing, we previously concluded in a nonprecedential decision that evaluating a licensee's primary residence does not require DHS to consider the resident's wellbeing. *See In re Casterton*, No. A21-1393, 2022 WL 2912152, at *3 (Minn. App. July 25, 2022).[7]

Finally, relators argue that DHS acted arbitrarily and capriciously because it was biased against Yusuf. But there is no evidence in the record to support relators' argument.[8] In the absence of such evidence, relators' argument fails. *See In re Dakota Cnty. Mixed Mun. Solid Waste Incinerator*, 483 N.W.2d 105, 106 (Minn. App. 1992).

**Affirmed.**

---

[7] This opinion is nonprecedential and, therefore, not binding. We cite *Casterton* as persuasive authority only. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).

[8] We acknowledge that relators' counsel attempted to elicit testimony regarding bias at the contested-case hearing and that the ALJ did not allow this testimony. But relators did not challenge this evidentiary ruling before the ALJ in its exceptions to the ALJ report and recommendation, or make a specific challenge to this evidentiary ruling on appeal. Therefore, this issue is forfeited. *See Rochester City Lines Co. v. City of Rochester*, 913 N.W.2d 443, 448 (Minn. 2018) ("[T]he quasi-judicial decision-maker must be given an opportunity to consider and address the issue, or it will be forfeited." (quotation omitted)).